# FOR PUBLICATION



ATTORNEYS FOR APPELLANTS:

**PETER M. RACHER**
**THERESA M. WILLARD**
Plews Shadley Racher & Braun LLP
Indianapolis, Indiana

ATTORNEYS FOR APPELLEES:

**MARK DAVID GERTH**
**BRENT R. WEIL**
Kightlinger & Gray LLP
Indianapolis, Indiana

**THOMAS E. BIRSIC**
**MICHAEL J. R. SCHALK**
**ANDREW R. STANTON**
**GREGORY T. STURGES**
K&L Gates LLP
Pittsburgh, Pennsylvania

**RENE P. TATRO**
Tatro Tekosky Sadwick LLP
Los Angeles, California

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| BILLY L. MUSGRAVE, JR., and KIM A. MUSGRAVE, )<br><br>Appellants-Plaintiffs, )<br><br>vs. )<br><br>THE ALUMINUM COMPANY OF AMERICA, INC., )<br>and ALCOA FUELS, INC., )<br><br>Appellees-Defendants. ) | No. 87A04-1205-CT-276 |

APPEAL FROM THE WARRICK CIRCUIT COURT
The Honorable Carl A. Heldt, Special Judge
Cause No. 87C01-0601-CT-6

**August 6, 2013**

**OPINION - FOR PUBLICATION**

**NAJAM, Judge**

## STATEMENT OF THE CASE[1]

In 2006, Bil and Kim Musgrave filed suit against The Aluminum Company of America, Inc. ("Alcoa") and its wholly owned subsidiary, Alcoa Fuels, Inc. ("Alcoa Fuels"). According to their complaint, Bil had been exposed to Alcoa's toxic chemicals both in the course of his work on land owned by Alcoa Fuels and his recreational use of that land, which caused Bil to develop a rare form of cancer. Before trial, the court dismissed the Musgraves' work-related claims pursuant to Indiana Trial Rule 12(B)(1) for lack of subject matter jurisdiction. Following a trial on the Musgraves' recreational claims, the jury returned a general verdict in favor of Alcoa and Alcoa Fuels.

On appeal, the Musgraves raise three issues for our review, but we need only address the following two dispositive issues[2]:

1.    Whether the trial court properly dismissed the Musgraves' work-related claims.

2.    Whether the trial court erroneously instructed the jury on the statute of limitations on the Musgraves' claims that their injuries resulted from their recreational exposure to Alcoa's chemicals.

We affirm.

## FACTS AND PROCEDURAL HISTORY

In the 1960s and 1970s, Alcoa dumped industrial waste at the Squaw Creek Mine ("Squaw Creek"), which is about fifteen miles from Alcoa's smelting plant on the Ohio River. Squaw Creek is a surface coal mine near Boonville in Warrick County and is

---

[1]  We held oral argument on June 25, 2013.

[2]  Given our holding, we need not address the Musgraves' additional assertion that the trial court erroneously dismissed their claims for emotional distress.

2

owned by Alcoa Fuels.  Some of this waste included polycyclic aromatic hydrocarbons ("PAHs").

In January of 1960, Alcoa entered into a "Joint Venture Agreement" ("the JVA") with Peabody Coal Company ("Peabody").  Appellants' App. at 752.  Pursuant to the JVA, "[t]he name of this Joint Venture is:  Squaw Creek Coal Company" ("SCCC").[3]  Id. SCCC mined coal from Squaw Creek at least in part to power Alcoa's aluminum smelting plant on the Ohio River.

The JVA described its purpose as well as Peabody's and Alcoa's responsibilities as follows:

Section 1.3.  Purposes.  The purposes of the Joint Venture are:

(1)     To develop and conduct coal mining operations on lands now or hereafter leased or owned by [SCCC] in Warrick, Vanderburgh, Spencer and Gibson Counties, Indiana, and to acquire by purchase, lease or otherwise, all of the necessary machinery, equipment and facilities;

(2)     To engage in the business of mining, processing, selling and delivering coal from such lands;

(3)     To carry on any other activities necessary or incidental to the foregoing.

[SCCC] shall not engage in any other business or activity without the written agreement of the parties.

\* \* \*

Section 2.2.  Responsibilities of Peabody.

---

[3]  The JVA shortens the name to "Squaw Creek," but in their briefs the parties consistently use "Squaw Creek" to refer to the location of the mine and "SCCC" to refer to the name of the company created in the JVA.

3

(a)     Peabody, with its own employees (who shall not thereby become [SCCC] employees) and at its own cost and expense, shall be responsible for:

(1)     All administration, general supervision, management and technical assistance;

(2)     All of the purchasing (except purchases which Alcoa has advised Peabody in advance can, in Alcoa's opinion, be made more advantageously by Alcoa);

(3)     Keeping all books and records and doing all accounting work; and

(4)     Furnishing all general engineering.

(b)     Peabody shall carry out its responsibilities listed above in such a manner as to provide efficient and economical planning, construction, development and conducting of the mining operations, equal in all respects to the like services performed by Peabody's general offices for the mines owned by it or its subsidiaries.

(c)     [SCCC] shall pay Peabody each month, as an allowance for Peabody's costs and expenses incurred in carrying out its responsibilities listed above, an amount equal to 2.939% of [the] gross invoiced sales price for coal mined and sold by [SCCC].

(d)     In the event that, after initial delivery of coal by [SCCC], deliveries of coal by [SCCC] are suspended for any period in excess of sixty days, [SCCC] shall pay Peabody the reasonable costs incurred by Peabody in performing any of the services listed in paragraph (a) of this Section 2.2 reasonably required to be performed during such period, together with any reasonable costs incurred by Peabody with its own employees, with the consent of Alcoa, in maintaining [SCCC's] mine in a standby status during such period.

Section 2.3.  Responsibilities of Alcoa.

(a)     Alcoa shall cause to be leased to [SCCC], on such terms as shall be mutually agreed, all coal reserves heretofore or hereafter acquired by Alcoa or any of its subsidiaries from Peabody or any of its subsidiaries in Warrick, Vanderburgh, Spencer and Gibson Counties, Indiana.

4

(b)      Alcoa shall lease or cause to be leased to [SCCC], on such terms as shall be mutually agreed, or shall make funds available to [SCCC] without interest whereby it may acquire[] all such equipment, machinery and facilities as shall be reasonably necessary for the proper and efficient mining (including transportation within Warrick County) by [SCCC] of its coal reserves in such manner as to fulfill its commitments for the sale of coal therefrom.   If Alcoa shall advance funds for the acquisition of such equipment, machinery and facilities, this Agreement shall be appropriately amended to provide for the repayment of such funds, the accounting for such assets and for the allocation of any profits or losses arising from the sale or other disposition thereof, all in such manner as shall recognize that such assets were acquired from funds advanced by Alcoa.

Id. at 752-55 (emphasis added). The JVA described SCCC's management as follows:

(a)      Subject to the limitations hereinafter set forth, Peabody shall manage and be in full charge of the design, construction and completion of the mining operations, the preparation of all plans, specifications, estimates and schedules, the selection and purchase or lease of all machines, equipment of all personnel required to carry on [SCCC's] business. Peabody shall also manage and be in full charge of all other business affairs of [SCCC]. Peabody shall perform its responsibilities under this [JVA] in a good and sufficient manner in accordance with sound mining practices. Failure so to do shall be deemed a failure by Peabody to perform its obligations hereunder.

(b)      Peabody shall be subject to the following limitations:

     (1)      Plans for the design and construction of any mine or related facilities, including but not limited to preparation plants, and all contracts for the purchase, lease or construction of machinery, equipment, buildings and other facilities shall be approved by Alcoa before any commitment is made by [SCCC] with respect thereto;

     (2)      Peabody shall not mortgage, pledge or otherwise encumber any property or assets owned or used by [SCCC], or confess any judgment against [SCCC], without the consent of Alcoa;

     (3)      No sale or agreement for the sale of coal shall be made without the written agreement of Alcoa and Peabody; provided, however, that the foregoing shall not prevent [SCCC] from disposing of coal rejected by any customer or from making sales of coal at the mine to [SCCC] employees and their families for their own consumption;

5

(4)     Peabody shall secure Alcoa's written approval before taking any steps resulting in any substantial change in the operation or policies of [SCCC's] affairs or business;

(5)     The mine superintendent or other person in charge of mining operations shall be selected by Peabody, but if he or any successor is not satisfactory to Alcoa, he shall, at Alcoa's request, be replaced by Peabody;

(6)     Alcoa shall have the right to designate all elections to be made by or for [SCCC] under the provisions of the Internal Revenue Code . . . , provided, however, that no such election shall be made by Alcoa without prior consultation with respect thereto with Peabody.

Id. at 755-56.  Finally, the JVA stated that "[SCCC's] annual net income or loss . . . shall be divided between the parties as follows:  Alcoa 60%[;] Peabody 40%."  Id. at 757.

From the time that Bil was at least ten years old, parts of Squaw Creek were open to the public for recreation.  Bil and, later, his wife Kim spent hundreds of hours over the years in recreational pursuits there.  In 1977, Bil was a member of the United Mine Workers of America labor union ("the Union"), and he worked at Squaw Creek.  Bil helped bury industrial waste at Squaw Creek and worked at the mine through 2000, when the mining operations ceased.

In 1996, Alcoa and Peabody entered into a Restated Joint Venture Agreement ("the RJVA") for the purposes of eventually terminating the Alcoa-Peabody relationship. The RJVA described Peabody's revised responsibilities in relevant part as follows:

(e)     After January 1, 1996, Peabody shall be solely responsible for the development of and shall be liable for all costs of exploring, developing and mining of the North 400 Area [of Squaw Creek], including Post-Mining Costs defined below, and Alcoa shall have no liability for any costs associated with the North 400 Area.  As used herein, "Post-Mining Costs" shall include all costs necessary to have reclamation bonds released from the North 400 Area and the Non-North 400 Area related to the disturbances attributable to [SCCC's] exploration, development and mining operations associated with the North 400 Area.  Peabody shall indemnify and hold

6

[SCCC] and Alcoa harmless with respect to all costs and liability relating to mining the North 400 Area. Notwithstanding the generality of the foregoing, said liabilities do not include the liabilities identified in Section 2.3(c) with respect to [Union] represented employees who work in the North 400 Area. . . . During the period in which [SCCC] mines the North 400 Area, the actual out-of-pocket costs paid by [SCCC] relating to [SCCC's] retiree health care benefit costs for retiree health care benefit services shall be borne by Peabody.

(f)     The parties anticipate that deliveries of coal from the North 400 Area will commence on or about August 1, 1996 [("the Transfer Date")]. . . . On the Transfer Date, Peabody shall assume liability for the retiree health care benefit costs for retiree health care benefit services received by the present and former salaried employees of Peabody located at [Squaw Creek]. Peabody shall assume liability for all applicable severance payments due salaried employees of Peabody located at [Squaw Creek] as of January 31, 1996[,] and all workers' compensation, occupational disease and black lung liabilities for such employees as of the Transfer Date. . . .

(g)     . . . Except as otherwise provided in this Agreement, Peabody shall . . . manage the final reclamation and mine closing activities for the Non-North 400 Area and the administration of [SCCC's] retiree health care benefits, severance, workers' compensation, occupational disease and black lung obligations to current and former [Union] represented employees of [SCCC]. . . .

Id. at 892-95. And, in Section 2.3, the RJVA described Alcoa's revised responsibilities as follows:

(c)     Except for liabilities and the out-of-pocket retiree health care benefit costs associated with the North 400 Area as provided in [Peabody's responsibilities] . . . , Alcoa will be responsible and assume all liability for (1) retiree health care benefits of [SCCC's] past and present work force represented by the [Union]; (2) all costs associated with severance payments to [the Union] represented employees after the date of this Amendment; (3) all the liability under present and future laws and labor agreements affecting the past and present work force represented by the [Union], including workers' compensation, occupational disease and black lung liabilities; (4) all costs associated with obligations under [numerous Union documents]; and (5) all costs associated with the final reclamation and mine closing expenses with respect to the lands mined by [SCCC]. . . . Alcoa . . . will indemnify and hold Peabody and [SCCC] harmless with respect to all costs and liability arising under this Section 2.3(c).

7

(d) . . . At any time after the completion of final reclamation of the North 400 Area, Alcoa may, at its sole option, retain an independent third party to manage [SCCC's] retiree health care benefits, severance, workers' compensation, occupational disease and/or black lung programs and, in such event, Peabody shall no longer be responsible for any matters relating thereto . . . .

Id. at 896-97 (emphases added).

Although Bil and other Union-represented miners at Squaw Creek would later provide affidavits in which they stated that they were employed by Peabody, Bil's Social Security Administration Form 1826, Itemized Statement of Earnings, reflects his employer as "Squaw Creek Coal Co." between 1977 and 2000. Id. at 1053-54. W-2s of other miners at Squaw Creek likewise name their employer as SCCC. See, e.g., id. at 1043-50. SCCC's annual budget included line items for "Represented Wages & Fringes" and payments for "Workmen's Comp." See, e.g., id. at 1098 (SCCC's 1986 budget). Those costs, among others, were used to determine SCCC's net profit or loss in a given year.

In September of 2000 Bil was diagnosed with cholangiocarcinoma, a rare form of cancer affecting the bile ducts and liver. Within a month of his diagnosis, Bil self-reported to his doctors that he may have suffered an "[o]ccupational hazard." Pls. Exh. M223, Transcript Vol. 19.[4] On March 5, 2001, Bil sent a letter to the Indiana Department of Natural Resources ("DNR") asking the DNR to "send all information you may have" in regard to environmental contamination at Squaw Creek. Defs. Exh. A231, Transcript

---

[4] Not surprisingly, the transcript of the trial court proceedings is voluminous, and the exhibits are separately appended to the transcript in seven additional volumes. But the pages of the transcript in which the exhibits appear are not individually numbered, and, contrary to Indiana Appellate Rules 50(A)(2)(g) and (3), the parties have not included the essential portions of the exhibits important to this appeal in the appendices. This has made verifying the parties' references to the exhibits cumbersome.

Vol. 21. DNR mailed that information to Bil on March 19, 2001, and in its letter DNR advised Bil to seek further information from the United States Environmental Protection Agency ("EPA") and the Indiana Department of Environmental Management ("IDEM"). Defs. Exh. A229, Transcript Vol. 21. In August of 2001 Bil received a life-saving liver transplant at the Mayo Clinic.

In April of 2003, Kim wrote to Senator Richard Lugar and other officials. According to her letter, she had learned from the EPA's website that "there were **70 MILLION GALLONS** of toxic substances dumped over a period of many years" at Squaw Creek. Defs. Exh. A226, Transcript Vol. 21 (emphasis original). Kim further expressed concern that Bil's rare form of cancer may have been contracted from his work at Squaw Creek, and she asked Senator Lugar to "have the Director of the EPA review" various other sites at Squaw Creek. Id. In August of 2003, Don Mottley, a local environmental activist who had been in contact with the Musgraves, likewise wrote to Senator Lugar, with a copy sent to Kim, asserting that many of the chemicals dumped at Squaw Creek were known or suspected carcinogens. Defs. Exh. A230, Transcript Vol. 21. Regarding PAHs, Mottley stated that "[s]tudies of people show that individuals exposed by breathing or skin contact for long periods to mixtures that contain PAHs . . . can also develop cancer." Id. Mottley expressly based his conclusions in part on the "Handbook of Toxic and Hazardous Chemicals" ("Toxic Chemicals Handbook"). Id.

About four months after Mottley's letter, on December 19, 2003, Bil handwrote the following letter: "Gerald[:] INFO for your review. What is the time line for Dr. Dahlgren's involvement?" Defs. Exh. A307, Transcript Vol. 21. Although Bil later

9

admitted at trial that he had written that letter, he testified that he had "no idea who Gerald [wa]s." Transcript at 1092. Bil further testified that, while a certain Dr. Dahlgren was the Musgraves' only expert witness on medical causation at their trial, Bil did not know "one way or another if that's who [he was] referring to in December of 2003." Id. at 1093.

Attached to Bil's letter were annotated excerpts from the Toxic Chemicals Handbook. See Defs. Exh. A308, Transcript Vol. 21. The annotations were in Bil's handwriting and called Gerald's attention to various chemicals that were known to attack the liver and bile functions in humans. Those emphasized chemicals were each identified in Mottley's August 2003 letter as chemicals known to be present at Squaw Creek and included certain PAHs.

Meanwhile, the Union attempted to have Alcoa describe what had been dumped at Squaw Creek. In August of 2004, Alcoa released that information. In "October 2005," Bil took that information to Dr. Gregory Gores, who had performed Bil's 2001 liver transplant and with whom Bil had annual follow-up exams. Appellants' App. at 282. According to Bil's subsequent affidavit, it was at this time that "Dr. Gores informed me that there are chemicals that could have caused my cancer . . . ." Id. However, on October 3, 2005, Dr. Gores wrote a letter to Bil's attorneys, in response to their inquiries, in which he stated that he was "not aware of any convincing data in man that any of these chemicals increase the risk" of contracting Bil's form of cancer. Defs. Exh. at A541, Transcript Vol. 22.

10

On January 6, 2006, the Musgraves filed their complaint against Alcoa and Alcoa Fuels (hereinafter collectively referred to as "Alcoa"), in which the Musgraves alleged personal injury and emotional distress as a result of Bil's work-related exposure and Bil and Kim's recreational exposure to the chemicals Alcoa had dumped at Squaw Creek. Alcoa moved to dismiss the Musgraves' claims for injuries arising out of his employment pursuant to Indiana Trial Rule 12(B)(1). Specifically, Alcoa asserted that the Musgraves' occupational claims fell under Indiana's Worker's Compensation Act and/or the Occupational Diseases Act and that, since the Musgraves did not properly pursue claims under either of those Acts, the trial court was without subject matter jurisdiction to consider them. The trial court granted Alcoa's motion and limited the Musgraves' claims at trial to whether their recreational exposure to chemicals at Squaw Creek caused their injuries.

In April and May of 2012, the court held a three-week jury trial on the Musgraves' recreational claims. Following the trial, the court instructed the jury as follows:

> Alcoa claims that the Musgrave[s'] claims are barred by what the law calls the statute of limitations. A statute of limitations provides a date by which a lawsuit must be filed, or else the claim is barred, and cannot be pursued by a plaintiff. The limitation on this case is two years. On the statute of limitations issue, Alcoa has the burden of proof.
> The two[-]year statute of limitations begins to run from the date the Plaintiff knew or should have discovered that he suffered an injury that was caused by an act of the Defendant[s]. This clearly would occur[] if and when[] the Plaintiff's doctor informed the Plaintiff that there was a reasonable possibility if not probability that the Plaintiff's injury was caused by an act of the Defendant. Events short of a doctor's diagnosis can provide a plaintiff with evidence of a reasonable possibility that another's act caused his injuries. A Plaintiff's mere suspicions or speculation would not be enough to trigger the statute of limitations.
> The complaint in this case was filed on January 6, 2006. If you find that Alcoa has proven by the greater weight of the evidence that, before

11

January 6, 2004, the Musgraves knew or should have discovered that they suffered an injury as a result of the Defendants' actions, then you must enter a verdict in favor of the Defendants. . . .

Instruction No. 25, Transcript Vol. 25.[5]  The Musgraves objected to the wording of Instruction No. 25 and proffered an alternative instruction, which would have stated that "the statute of limitations is triggered when a medical professional informs the plaintiff that there is a reasonable possibility if not probability that his injuries were caused by the defendant[s'] act or product . . . ."  Transcript at 3349.  The trial court overruled the Musgraves' objection and proffered instruction.

On May 1, the jury returned a general verdict in favor of Alcoa.  This appeal ensued.

## DISCUSSION AND DECISION

### Issue One:  Bil's Work-Related Claims and the Worker's Compensation Act

#### Overview

We first address whether the trial court properly dismissed the Musgraves' work-related claims against Alcoa.  Although the parties discuss nine subissues here, we need only address the following three subissues[6]:  (1) whether Alcoa and Peabody were

---

[5]  As with the exhibits, the jury instructions are in a separate volume of the transcript that is not paginated, and the instructions relevant to this appeal are not separately included in the parties' appendices.

[6]  As to the other subissues, in particular we decline the Musgraves' request to apply judicial estoppel against Alcoa.  In 1999, the Union brought a claim against Alcoa to the National Labor Relations Board ("NLRB").  The Union alleged that Alcoa was the alter ego of SCCC, with which the Union had a contract for employment services, and, as such, Alcoa was not permitted to hire non-Union miners.  Relying in part on evidence submitted by Alcoa, the NLRB concluded that the Union had not presented sufficient evidence to demonstrate that Alcoa "had any substantial or meaningful involvement with the labor relation matters concerning [SCCC's] bargaining unit employees."  Appellants' App. at 337.  Alcoa has never asserted otherwise in the instant proceedings.  Rather, Alcoa's position here is that SCCC is its

12

engaged in a joint venture; (2) if so, whether Indiana's Worker's Compensation Act ("the Act") grants the members of a joint venture immunity as a matter of law[7]; and (3) whether Bil was an employee of SCCC or Peabody. Each of these three subissues arises from the trial court's pretrial dismissal of the Musgraves' occupational claims under Indiana Trial Rule 12(B)(1) for lack of subject matter jurisdiction. The trial court's judgment was based on a paper record and, as such, our standard of review is de novo. GKN Co. v. Magness, 744 N.E.2d 397, 401 (Ind. 2001).

### Whether Alcoa and Peabody were Engaged in a Joint Venture

Whether Alcoa and Peabody were engaged in a joint venture is a threshold question and is based on their contractual relationship. As we have explained:

> When Indiana courts are called upon to interpret a contract, we apply the four-corners rule, which requires that[,] as to any matter expressly covered in the written contract, the provisions therein, if unambiguous, determine the terms of the contract. Words used in a contract are to be given their usual and common meaning unless, from the contract and the subject matter thereof, it is clear that some other meaning was intended.
>
> We interpret a written contract by reading the contract as a whole, and we attempt to construe the language so as to not render any words, phrases, or terms ineffective or meaningless. Thus, we must accept an interpretation of the contract which harmonizes its provisions. If the language of the contract is unambiguous and the intent of the parties is discernible from the written contract, the court must give effect to the terms of the contract. And, in reading the terms of a contract together, we keep in mind that the more specific terms control over any inconsistent general statements. Finally, whether a joint venture exists is generally a question of

---

joint venture and that, as a joint venture member, Alcoa is entitled to immunity from occupational claims under the Worker's Compensation Act. Judicial estoppel does not apply here. See Morgan Cnty. Hosp. v. Upham, 884 N.E.2d 275, 280 (Ind. Ct. App. 2008), trans. denied.

[7] Insofar as Bil's work-related claims also invoke Indiana's Occupational Diseases Act, our discussion of the Worker's Compensation Act is equally applicable. See, e.g., Ind. Code §§ 22-3-7-6 (exclusivity provision of the Occupational Diseases Act); 22-3-7-9(a) (definition of "employer").

fact. However, where that question can be resolved by looking only to undisputed facts or an unambiguous contract, the existence of a joint venture is a question of law . . . .

DLZ Ind., LLC v. Greene County, 902 N.E.2d 323, 327-28 (Ind. Ct. App. 2009) (citations omitted).[8]

A party's characterization of an association as a joint venture is not, standing alone, conclusive proof of a joint venture. Id. at 329. Rather, "we must look beyond labels to the substance of the underlying relationship . . . ." Id. In Walker v. Martin, 887 N.E.2d 125, 138 (Ind. Ct. App. 2008), trans. denied, we stated the standard for determining whether a joint venture exists:

> A joint venture has been defined as an association of two or more persons formed to carry out a single business enterprise for profit. For a joint venture to exist, the parties must be bound by an express or implied contract providing for (1) a community of interests, and (2) joint or mutual control, that is, an equal right to direct and govern the undertaking, that binds the parties to such an agreement. A joint venture is similar to a partnership except that a joint venture contemplates only a single transaction. A joint venture agreement must also provide for the sharing of profits.

(Citations omitted.) Further:

> Indiana courts have consistently preserved the commercial flavor of the joint venture concept, defining it as "an association of two or more persons to carry out a single business enterprise for profit." Beck v. Indiana Surveying Co., (1981) Ind. App., 429 N.E.2d 264, 268; Baker v. Billingsley, (1956) 126 Ind. App. 703, 708, 132 N.E.2d 273, 275-76, trans. denied; 17 I.L.E. Joint Adventures § 1, 51 (1959). . . . [I]n the seminal Indiana case on joint venture, Baker v. Billingsley, it was established that . . . an agreement to share profits is necessary and that ''a right of mutual control over the subject matter of the enterprise or over the property

        [8] Alcoa asserts in its brief that this court labeled SCCC a joint venture in a prior appeal between the Musgraves and SCCC. See Musgrave v. Squaw Creek Coal Co., 964 N.E.2d 891, 894 (Ind. Ct. App. 2012), trans. denied. However, our comment appeared in our statement of facts and was not analyzed, and the main issue on appeal involved a DNR decision to release portions of SCCC's reclamation bond on a surface mining permit. As such, we did not hold that SCCC was a joint venture.

engaged therein is essential to a joint adventure.'' 126 Ind. App. at 708, 132 N.E.2d at 276.

Lafayette Bank & Trust Co. v. Price, 440 N.E.2d 759, 762 (Ind. Ct. App. 1982). "As in a partnership, the parties to a joint venture are jointly and severally liable." DLZ, 902 N.E.2d at 330.

In January 1960, Alcoa entered into the JVA with Peabody. Pursuant to the JVA, "[t]he name of this Joint Venture is: Squaw Creek Coal Company." Appellants' App. at 752. Section 1.3 stated the purpose of the JVA, namely, to mine Squaw Creek. And Section 4.1(a) provided that "SCCC's annual net income or loss . . . shall be divided between the parties as follows: Alcoa 60%[;] Peabody 40%." Id. at 757. Again, "[a]n agreement to share the risk and the reward of the [alleged joint venture] is an essential ingredient and condition precedent to shared profits." DLZ, 902 N.E.2d at 331. Moreover, SCCC's net profits in a given year were less payments made for worker's compensation insurance. See, e.g., Appellants' App. at 1098.

Further, both Alcoa and Peabody had "an equal right to direct and govern the undertaking, that binds the parties to [their] agreement." See Walker, 887 N.E.2d at 138. In Sections 2.2 and 2.3, the JVA described the responsibilities of both Peabody and Alcoa, respectively. Pursuant to Section 2.2, Peabody's responsibilities included administration, general supervision, management and technical assistance, purchasing, keeping all books, records, and accounting, and furnishing general engineering. Appellants' App. at 754. Pursuant to Section 2.3, Alcoa's responsibilities included leasing all equipment, machinery, facilities, and coal reserves from Alcoa Fuels to SCCC. Id. at 754-55.

The JVA required that Alcoa and Peabody agree on several aspects of SCCC's management. For example, Section 2.4 of the JVA states:

(b)     Peabody shall be subject to the following limitations:

(1)     Plans for the design and construction of any mine or related facilities, including but not limited to preparation plants, and all contracts for the purchase, lease or construction of machinery, equipment, buildings and other facilities shall be approved by Alcoa before any commitment is made by [SCCC] with respect thereto;

(2)     Peabody shall not mortgage, pledge or otherwise encumber any property or assets owned or used by [SCCC], or confess any judgment against [SCCC], without the consent of Alcoa;

(3)     No sale or agreement for the sale of coal shall be made without the written agreement of Alcoa and Peabody; provided, however, that the foregoing shall not prevent [SCCC] from disposing of coal rejected by any customer or from making sales of coal at the mine to [SCCC] employees and their families for their own consumption;

(4)     Peabody shall secure Alcoa's written approval before taking any steps resulting in any substantial change in the operation or policies of [SCCC's] affairs or business;

(5)     The mine superintendent or other person in charge of mining operations shall be selected by Peabody, but if he or any successor is not satisfactory to Alcoa, he shall, at Alcoa's request, be replaced by Peabody;

(6)     Alcoa shall have the right to designate all elections to be made by or for [SCCC] under the provisions of the Internal Revenue Code . . . , provided, however, that no such election shall be made by Alcoa without prior consultation with respect thereto with Peabody.

Id. at 755-56 (emphases added).

In sum, the JVA is unambiguous on the intent of Alcoa and Peabody to form a joint venture. The JVA explicitly provides for shared risk, shared profits, and shared rights of mutual control. Thus, Alcoa and Peabody were engaged in a joint venture, through SCCC, to mine Squaw Creek.

16

<u>Whether the Act Grants Joint Venture</u>
<u>Members Immunity as a Matter of Law</u>

Having established that Alcoa and Peabody were engaged in a joint venture, we next consider whether the Act grants the joint venture and its members immunity as a matter of law from a civil action in tort by employees of the joint venture.

> A question of statutory interpretation is a matter of law. In such interpretation, the express language of the statute and the rules of statutory interpretation apply. We will examine the statute as a whole, and avoid excessive reliance on a strict literal meaning or the selective reading of words. Where the language of the statute is clear and unambiguous there is nothing to construe. However, where the language is susceptible to more than one reasonable interpretation, the statute must be construed to give effect to the legislature's intent. The legislature is presumed to have intended the language used in the statute to be applied logically and not to bring about an absurd or unjust result. Thus, we must keep in mind the objective and purpose of the law as well as the effect and repercussions of such a construction.

<u>A.J. v. Logansport State Hosp.</u> 956 N.E.2d 96, 104-05 (Ind. Ct. App. 2011) (quotations omitted).

Indiana law is clear that "[t]he rights and remedies granted to an employee subject to [the Act] on account of personal injury or death . . . shall exclude all other rights and remedies of such employee . . . at common law or otherwise, on account of such injury or death . . . ." Ind. Code § 22-3-2-6. As we have explained:

> Exclusivity works a compromise—persons injured at work can expect compensation regardless of fault, and therefore free of the complexities and delay of legal process, although perhaps less than might be recovered in a jury verdict, whereas employers agree to pay compensation even where they bear no fault for the injury, in exchange for freedom from the expense of litigation and the possibility of large jury awards to injured employees, yielding an improved ability to predict the costs of workplace injuries.

17

Greene v. Westinghouse Elec. Corp., 573 N.E.2d 452, 453 (Ind. Ct. App. 1991), trans. denied.  The Act defines an "employer" as:

> "Employer" includes the state and any political subdivision, any municipal corporation within the state, any individual or the legal representative of a deceased individual, firm, association, limited liability company, or corporation or the receiver or trustee of the same, using the services of another for pay.  A parent corporation and its subsidiaries shall each be considered joint employers of the corporation's, the parent's, or the subsidiaries' employees . . . .

I.C. § 22-3-6-1(a) (emphases added).

Thus, under the Act, the definition of an employer includes an "association."  And Indiana courts have defined joint ventures as an "association of two or more persons formed to carry out a single business enterprise for profit."  Walker, 887 N.E.2d at 138.  We have also described joint ventures as analogous to partnerships:  "A joint venture is similar to a partnership except that a joint venture contemplates only a single transaction."  Id.  Under Indiana law, "[a] partnership is an association of two (2) or more persons to carry on as co-owners a business for profit . . . ."  I.C. § 23-4-1-6(1) (emphasis added).

We conclude that an "association" under Indiana Code Section 22-3-6-1 includes a joint venture.  That is particularly true where, as here, SCCC's net profits in a given year, which were distributed to Alcoa and Peabody, were net of payments made for worker's compensation insurance.  See, e.g., Appellants' App. at 1098.  It would be contrary to the intent of the Act for an enterprise to pay for worker's compensation insurance without receiving the statutory benefit of tort immunity from work-related claims.  See, e.g., Greene, 573 N.E.2d at 453.

18

Nonetheless, the Musgraves assert that the plain language of the statute excludes joint ventures and that, if our legislature had wanted to use that term in the statute, it would have done so. But this court "will examine the statute as a whole, and avoid excessive reliance on a strict literal meaning." A.J. 956 N.E.2d at 104. To exclude joint ventures from the Act would require a strict, literal reading that is not necessary. It would also exclude joint ventures when other similar business structures, such as firms, associations, and parent corporations, are included. Further, we will interpret a statute to avoid an absurd or unjust result. Id. To exclude joint ventures from the definition of an employer would be absurd since joint ventures are associations by definition, and it would produce an unjust result on these facts since SCCC paid for worker's compensation insurance.[9] See Walker, 887 N.E.2d at 138. Thus, a joint venture is within the statutory definition of an employer.

It is well-established Indiana law that an employee of a joint venture is the employee of each member of the joint venture. Baker, 132 N.E.2d at 275-76. In Baker, Baker was the owner of a carnival enterprise. He entered into a contract to sell the carnival to Allen. At the time of the contract, Baker was in possession and control of a Ferris wheel and a special truck used for its transportation, which were not included in the contract. However, Baker orally agreed to furnish the Ferris wheel and truck to Allen for Allen's use in connection with the carnival, and Allen furnished and paid for all help

---

[9] The Musgraves cite Department of Treasury of Indiana v. Muessel, 218 Ind. 250, 256, 32 N.E.2d 596, 598 (1941), to argue that the word "includes" in "[i]ts ordinary use is as a term of limitation . . . ." See Appellants' Br. at 20-21. But the word used in Muessel was the modifier "including," a participle that is often a word of limitation, not the verb "includes," which, as the Tax Court has recognized, is a "significant" difference. See May Dep't Stores Co. v. Ind. Dep't of State Revenue, 749 N.E.2d 651, 662 (Ind. Tax Ct. 2001) ("It would be unreasonable and illogical to equate 'including' . . . with the word 'includes' . . . .").

19

necessary for its operation and transportation from place to place. The net proceeds of the operation were split evenly between Baker and Allen, and Baker had control of the Ferris wheel while it was being used by the carnival.

Allen hired Billingsley to erect and assist with the operation of the Ferris wheel. While erecting the Ferris wheel, Billingsley lost his right arm when it was entangled in the ropes of the hoisting gear. It was undisputed that "[f]rom the time [Billingsley] was employed until he was hurt he never saw Baker and Baker never gave him any orders or directed his work . . . . As far as [Billingsley] knew Allen was his sole boss and all work he did was done under Allen's direction." Id. at 275.

Nonetheless, Billingsley filed a worker's compensation claim and won an award against both Baker and Allen. Baker appealed that decision, contending that he was not liable because Billingsley was "in the sole employ of Allen at the time he was injured." Id. at 275. Baker argued that Billingsley was on Allen's payroll and Allen withheld taxes and unemployment insurance premiums from Billingsley's wages. However, we held that Baker and Allen's agreement with respect to the Ferris wheel met the requirements of a joint venture, and that "the liability of persons engaged in a joint adventure is that of partners." Id. at 276; see also DLZ, 902 N.E.2d at 330 ("As in a partnership, the parties to a joint venture are jointly and severally liable."). Accordingly, we affirmed Baker's liability to Billingsley.

The Musgraves argue that "the Baker court's holding is properly limited to situations where each joint venturer has already been determined to be the employer of the injured employee." Appellants' Br. at 33. This is incorrect. The court in Baker did

20

not assume that Billingsley was Baker's employee, nor did it engage in an analysis of whether Billingsley was Baker's employee. The court instead analyzed whether Baker and Allen were engaged in a joint venture and, finding that they were, held them to be liable as "partners." 132 N.E.2d at 276. Thus, the holding of <u>Baker</u> was that the members of a joint venture are each liable under the Act for any employees injured while working for the joint venture. <u>Id.</u> at 275-76. It is a necessary corollary that the members of a joint venture are immune from tort liability for work-related claims made outside the scope of the Act. I.C. § 22-3-2-6.

The relationship between Baker and Billingsley is similar to the relationship between Alcoa and Musgrave. Since SCCC was the joint venture of Alcoa and Peabody, under Indiana's statutes and case law Alcoa is the employer of any joint venture employees. Therefore, if Bil was the employee of SCCC, Alcoa would be entitled under the Act to immunity from his work-related tort claims.[10]

<u>Whether Bil was the Employee of SCCC and</u>
<u>Whether Alcoa is Immune under a Factors Analysis</u>

The final question then is whether Bil was the employee of SCCC. The Musgraves assert that he was not and, rather, that he was the employee of Peabody. The Musgraves also assert that, even if SCCC is a joint venture, because Bil was the employee of Peabody, Alcoa is not protected from Bil's work-related claims by the Act's exclusivity provisions. Instead, the Musgraves continue, the proper method to determine

---

[10] There is no dispute that, while the JVA did not delineate Peabody's and Alcoa's liabilities in any manner other than jointly and severally, the RJVA did do so on these facts. In particular, Section 2.3(c) of the RJVA "explicitly allocated to Alcoa liability for costs associated with workers' compensation for the joint venture's former [Union]-represented workforce, including Mr. Musgrave." Appellees' Br. at 19.

whether Alcoa was also Bil's employer under the Act is to apply the multi-factor analysis set forth in Hale v. Kemp, 579 N.E.2d 63, 67 (Ind. 1991). We cannot agree.

The Musgraves' argument on this issue assumes their conclusion that Bil was the employee of Peabody. In support of this assumption, the Musgraves rely substantially on Section 2.2 of the JVA and affidavits filed by Bil and other Union workers at Squaw Creek. According to Section 2.2 of the JVA:

Section 2.2. Responsibilities of Peabody.

(a)      Peabody, with its own employees (who shall not thereby become [SCCC] employees) and at its own cost and expense, shall be responsible for:

   (1)      All administration, general supervision, management and technical assistance;

   (2)      All of the purchasing (except purchases which Alcoa has advised Peabody in advance can, in Alcoa's opinion, be made more advantageously by Alcoa);

   (3)      Keeping all books and records and doing all accounting work; and

   (4)      Furnishing all general engineering.

Appellants' App. at 754 (emphasis added). The Musgraves interpret Section 2.2 to create a wall of separation between Peabody employees and Alcoa employees. But, insofar as that might be true, it is true only for the four listed tasks, which are managerial. The Musgraves do not suggest that Bil performed any of those four listed tasks, nor do they cite evidence in the record that would support such a suggestion.

Neither is Bil's perception, or the perception of any other employee, of the identity of his employer dispositive in determining who his employer actually was. In Baker,

22

Billingsley only interacted with Allen, was paid by Allen, and believed Allen to be his sole employer. Nonetheless, we held that Allen and Baker were engaged in a joint venture and, as such, they were jointly and severally liable to Billingsley. Baker, 132 N.E.2d at 275. Thus, the employee's perception of who his employer is is not dispositive.

On the other hand, there is objective evidence that Bil was the employee of the joint venture, SCCC, and not of Peabody. In particular, Bil's Social Security earnings statement indicates that SCCC was his employer between 1977 and 2000. Appellants' App. at 1053-54. W-2s of other miners at Squaw Creek likewise named their employer as SCCC. See, e.g., id. at 1043-50. And, as described above, Alcoa and Peabody were engaged in a joint venture. Thus, given that Bil acknowledges he was working at Squaw Creek pursuant to a relationship with Peabody, under our holding in Baker Bil was an employee of SCCC.

Likewise, Hale is distinguishable because it involved a "borrowed servant" and two distinct employers, while the instant case involves a single employer, SCCC, albeit with potential joint and several liability between Peabody and Alcoa as the members of the joint venture. See 579 N.E.2d at 67. In Hale, an employee's general employer loaned him to a special employer and, in the course of working for the special employer, the employee was injured. Because the employee was a "borrowed" employee, the court considered whether the special employer could claim employer status under the Act. The court analyzed the relationship between the employee and the special employer by applying a seven-factor test:

23

> To determine if an employer-employee relationship exists which may subject an employee to the Worker's Compensation Act so as to bar his common law claim against the special employer to whom he was "loaned," the following factors have been enumerated: (1) the right to discharge; (2) the mode of payment; (3) supplying tools or equipment; (4) belief of the parties in the existence of an employer-employee relationship; (5) control over the means used in the results reached; (6) length of employment; and (7) establishment of the work boundaries.

Id. The court held that, on the facts before it, the special employer was not an employer of the employee and, therefore, was not entitled to immunity under the Act. Id.

Here, the Hale test is inapposite because Bil was not a "borrowed" employee and there are not two employers. See id.; see also Moberly v. Day, 757 N.E.2d 1007, 1010 n.3 (Ind. 2001) (noting that the seven-factor Hale test is "for determining whether a person is an employee of two different employers"). Unlike those circumstances that would give rise to the Hale test, Bil was the employee of SCCC, which, in turn, was the joint venture entity of Alcoa and Peabody. Accordingly, Hale does not apply, Alcoa is immune under the Act from Bil's work-related claims, and we affirm the trial court's dismissal of the Musgraves' work-related claims pursuant to Indiana Trial Rule 12(B)(1).

### Issue Two: The Musgraves' Recreational Claims and the Statute of Limitations

We next consider the Musgraves' challenge to Jury Instruction No. 25, which instructed the jury on the statute of limitations, following the trial on the Musgraves' allegations that their recreational exposure to Alcoa's chemicals caused them injury. The Musgraves make two arguments on this issue. First, they assert that the instruction was an incorrect statement of law. Second, they assert that there was insufficient evidence to support the giving of the instruction. We address each argument in turn.

24

The Musgraves first assert that Instruction No. 25 was an incorrect statement of

law. As our supreme court has explained:

> The trial court has broad discretion as to how to instruct the jury, and we
> generally review that discretion only for abuse. Where, however, as here,
> the appellant's challenge to the instruction is . . . that the instruction was an
> incorrect statement of law[,] we review the trial court's interpretation of
> that law de novo.

Kane v. State, 976 N.E.2d 1228, 1231 (Ind. 2012) (citation omitted).

The parties agree that our supreme court's opinion in Degussa v. Mullens, 744

N.E.2d 407 (Ind. 2001), states the law on when the statute of limitations begins to run for

toxic tort cases. In Degussa, the court held as follows:

> While the present case is one based on a products liability claim, case law
> regarding medical malpractice claims is instructive because medical and
> diagnostic issues are common between the two actions, the statute of
> limitations for both claims is two years, and discovery is sometimes at issue
> in determining whether the respective statutes of limitation have been
> triggered. The question of when a plaintiff alleging medical malpractice
> "discovered facts which, in the exercise of reasonable diligence, should
> lead to the discovery of the medical malpractice and resulting injury, is
> often a question of fact." Van Dusen v. Stotts, 712 N.E.2d 491, 499 (Ind.
> 1999).
>
> We agree with the Court of Appeals's assertion in the present case
> that a plaintiff need not know with certainty that malpractice caused his
> injury[] to trigger the running of the statutory time period. Once a
> plaintiff's doctor expressly informs the plaintiff that there is a "reasonable
> possibility, if not a probability" that an injury was caused by an act or
> product, then the statute of limitations begins to run and the issue may
> become a matter of law. When a doctor so informs a potential plaintiff, the
> plaintiff is deemed to have sufficient information such that he or she should
> promptly seek "additional medical or legal advice needed to resolve any
> remaining uncertainty or confusion" regarding the cause of his or her
> injuries, and therefore be able to file a claim within two years of being
> informed of a reasonably possible or likely cause. An unexplained failure

to seek additional information should not excuse a plaintiff's failure to file a claim within the statutorily defined time period.

Although "[e]vents short of a doctor's diagnosis can provide a plaintiff with evidence of a reasonable possibility that another's" product caused his or her injuries, a plaintiff's mere suspicion or speculation that another's product caused the injuries is insufficient to trigger the statute. . . .

Id. at 410-11 (alteration original; some citations omitted).

Instruction No. 25 stated, in relevant part, as follows:

The two[-]year statute of limitations begins to run from the date the Plaintiff knew or should have discovered that he suffered an injury that was caused by an act of the Defendant[s]. This clearly would occur[] if and when[] the Plaintiff's doctor informed the Plaintiff that there was a reasonable possibility if not probability that the Plaintiff's injury was caused by an act of the Defendant. Events short of a doctor's diagnosis can provide a plaintiff with evidence of a reasonable possibility that another's act caused his injuries. A Plaintiff's mere suspicions or speculation would not be enough to trigger the statute of limitations.

Instruction No. 25, Transcript Vol. 25 (emphasis added).

The Musgraves assert that Instruction No. 25 is an incorrect statement of law because "[t]he statute of limitations . . . cannot begin running in a case of this complexity . . . until a medical professional advises the plaintiff of at least a reasonable possibility that the plaintiff's injury was caused by the defendant." Appellants' Br. at 44. Thus, the Musgraves would require, as a matter of law, that the statute of limitations does not begin to run in "complex[]" cases until a medical professional has informed the plaintiff of at least a reasonable possibility that his injuries were caused by the defendant. Id.

But the Musgraves' requirement is contrary to Degussa. As our supreme court explained, a medical professional's opinion can cause the statute of limitations to begin to run, but such an opinion is not a necessary prerequisite to trigger the statute of

26

limitations.[11]  Degussa, 744 N.E.2d at 411.  Rather, "[e]vents short of a doctor's diagnosis can provide a plaintiff with evidence of a reasonable possibility that another's product caused his or her injuries."  Id. (alteration original; quotations omitted).  Whether such events occurred "is often a question of fact."  Id. (quoting Van Dusen, 712 N.E.2d at 499).  Instruction No. 25 tracks Degussa and is a correct statement of law.

Whether the Instruction is
Supported by the Evidence

The Musgraves also assert that there was no evidence in the record to support giving Instruction No. 25.  In determining whether there was evidence presented at trial to support giving an instruction, we review the trial court's decision for an abuse of discretion.  Kane, 976 N.E.2d at 1231.  Under the abuse of discretion standard, we "view the evidence in a light most favorable to the decision" of the trial court.  Short v. State, 962 N.E.2d 146, 148 (Ind. Ct. App. 2012).

However, the Musgraves did not preserve this argument for appellate review because they did not object to Instruction No. 25 on this ground to the trial court.  It is well established that "[a] party may not object on one ground at trial and seek reversal on appeal using a different ground."  Malone v. State, 700 N.E.2d 780, 784 (Ind. 1998); see also Showalter v. Town of Thorntown, 902 N.E.2d 338, 342 (Ind. Ct. App. 2009) (stating that the trial court "cannot be found to have erred as to an issue or argument that it never

---

[11]  In their reply brief, the Musgraves cite an unpublished order from the United States District Court for the Southern District of Indiana, in which the court stated that Indiana's statute of limitations begins to run "only once a plaintiff's doctor expressly informs the plaintiff that there is a reasonable probability that an injury was caused by an act or product."  Cunningham v. Masterwear, Inc., 2006 WL 517612 at *8 (S.D. Ind. Mar. 1, 2006).  This appears to be a misstatement of the law described in Degussa.  In any event, we are not bound by a federal court's interpretation of Indiana law.  See, e.g., Kirby v. Ashland Oil Co., 463 N.E.2d 1127, 1129 n.3 (Ind. Ct. App. 1984).

had an opportunity to consider") (quotation omitted), trans. denied. The Musgraves did not object to the jury instruction on the statute of limitations on the ground that such an instruction was not supported by the evidence. Rather, the Musgraves objected only to the language of Instruction No. 25 under Degussa and proffered an alternative instruction, which would have stated that the statute of limitations could not have begun to run until a medical professional had informed Bil of at least a reasonable possibility that his injuries were caused by Alcoa. See Transcript at 3349.[12] Thus, not only did the Musgraves not present this argument to the trial court, they proffered their own instruction on the statute of limitations. Their argument on appeal that there was no evidence to support giving any such instruction is contrary to their position in the trial court and is waived.[13]

Further, the Musgraves do not present their evidentiary challenge as a challenge to the sufficiency of the evidence underlying the jury's verdict. Nor could they. In Henri v. Curto, our supreme court held:

> a claim of insufficient evidence must be preserved by proper presentation to the trial court. Such a challenge may not be initially raised on appeal in civil cases if not previously preserved in the trial court by either a motion for judgment on the evidence filed before judgment or in a motion to correct error.

---

[12]  At oral argument, the Musgraves provided various citations to the appellate record that purported to show their preservation of this issue. Those citations do not support their assertion that they preserved this issue for our review.

[13]  Likewise, insofar as the Musgraves assert that the trial court erred when it "permitt[ed] Alcoa to argue in closing statement[s] that the Musgraves, not Alcoa, bore the burden of disproving Alcoa's statute of limitations defense," the Musgraves do not cite the portion of the record that demonstrates their objection to this purported issue. See Appellants' Br. at 52. And the Musgraves' further assertion that "[i]t was error for the court to have permitted Alcoa to question Kim Musgrave about contacting [the California law firm of] Masry and Vititoe," see id., is not developed in light of our standard of review, the law relating to such issues, or whether the trial court's purported error affected the Musgraves' substantial rights. See Ind. Appellate Rule 46(A)(8)(a).

28

908 N.E.2d 196, 208 (Ind. 2009). The Musgraves did not file either a motion for judgment on the evidence or a motion to correct error on Alcoa's statute of limitations defense. When we review a trial court's ruling on a motion for judgment on the evidence, we consider only the evidence and reasonable inferences most favorable to the nonmoving party. Raess v. Doescher, 883 N.E.2d 790, 793 (Ind. 2008). But, here, there was no Trial Rule 50 motion and no motion to correct error, and we have nothing to review. Accordingly, the Musgraves have not preserved their argument that Instruction No. 25 is not supported by the evidence.

## Conclusion

In sum, the trial court properly dismissed the Musgraves' work-related claims against Alcoa pursuant to Indiana Trial Rule 12(B)(1). The trial court also properly instructed the jury on the statute of limitations, and the Musgraves did not preserve their argument that the jury instruction was not supported by the evidence for appellate review. Accordingly, we affirm the trial court's judgment and the jury's verdict for Alcoa.

Affirmed.

BAILEY, J., and BARNES, J., concur.