NOT FOR PUBLICATION

**FILED**

UNITED STATES COURT OF APPEALS

FEB 25 2026

FOR THE NINTH CIRCUIT

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

RESEARCH CORPORATION
TECHNOLOGIES INC.,

No. 24-4786

Plaintiff-Appellee,

D.C. No. 4:16-cv-00191-SHR

v.

MEMORANDUM[*]

ELI LILLY AND COMPANY,

Defendant-Appellant.

Appeal from the United States District Court
for the District of Arizona
Scott H. Rash, District Judge, Presiding

Argued and Submitted September 15, 2025
Phoenix, Arizona

Before: COLLINS, MENDOZA, and DESAI, Circuit Judges.

Eli Lilly and Company ("Lilly") appeals the district court's grant of

summary judgment to Research Corporation Technologies ("RCT") on RCT's

breach-of-contract claim for royalties. We have jurisdiction under 28 U.S.C.

§ 1291. Reviewing the grant of summary judgment de novo, *see*, *e.g.*, *Desire, LLC*

*v. Manna Textiles, Inc.*, 986 F.3d 1253, 1259 (9th Cir. 2021), we reverse and

remand.

---

[*] This disposition is not appropriate for publication and is not precedent except as
provided by Ninth Circuit Rule 36-3.

# I

Lilly develops and manufactures diabetes medications including Humulin® and Humalog®. Lilly uses *Escherichia coli* ("*E. coli*") to express precursor proteins to the active pharmaceutical ingredients ("APIs") in these medications. The precursor proteins "have extra amino acids" that must be removed for the proteins to become "functional" and "active." To trim the extra amino acids from the precursor proteins, Lilly uses the enzyme Carboxypeptidase B ("CpB"). After trimming, CpB is removed and is not present in Lilly's consumer-ready diabetes medications. Lilly uses *Pichia pastoris* ("*Pichia*") to express a precursor to CpB.

Lilly obtained *Pichia* by entering into a License Agreement (the "Agreement") with Phillips Petroleum Company ("Phillips") on April 4, 1990.[1] The Agreement defines several important terms. "Expression System" is defined as a *Pichia*-based expression system containing a vector "which directs the production of a Product or Reagent." "Product" is defined as "End Product or Bulk Product." "End Product" is defined as "a human pharmaceutical or diagnostic . . . which is produced by an Expression System and which is sold in a final dosage form for utilization by an Ultimate Consumer and is not intended or marketed for further formulation, processing or chemical transformation." The other type of Product, "Bulk Product," is not at issue here. "Reagent" is defined as

---

[1] It is undisputed that the Agreement is governed by Indiana law.

"a material produced using the Expression Technology and which is used in the manufacture or development of Product or which is used for research purposes." "Expression Technology" is defined as "PHILLIPS technology and materials useful in the production of Product or Reagent."

Phillips granted Lilly a "license to use" *Pichia* "to produce Product or Reagent . . . [,] use Product or Reagent for research purposes, or sell the thus produced Product or Reagent for use in humans or for diagnostic purposes related to human medicine." In return, Lilly promised certain royalties or an annual $30,000 maintenance fee if royalties failed to exceed a particular threshold. The royalty structure has two parts: a royalty of two percent of the "Net Sales Value for End Product or Reagent sold by [Lilly]" and a payment of twenty-five percent of "savings resulting from the use of Reagent in the manufacture of Product as compared to the best prior method of preparing this Product."

In September 1993, RCT purchased Phillips's *Pichia* assets. In October 2015, Lilly first notified RCT that it was using *Pichia* to manufacture CpB. In April 2016, RCT sued Lilly for breach of contract in the United States District Court for the District of Arizona. RCT alleged that Lilly had used *Pichia* to produce CpB outside the scope of what was authorized under the Agreement ("Count I"). Specifically, RCT alleged that, because the APIs were not produced by a *Pichia* expression system, they were not within the definition of "Product";

3

and because CpB was not used to manufacture Product, CpB was not a "Reagent." Later, in its Fourth Amended Complaint, RCT alleged, in the alternative, that "[t]o the extent Lilly used an Expression System to produce or direct the production of 'Product,' Lilly . . . breached the License Agreement by failing to pay royalties when due" ("Count III"). Both Lilly and RCT moved for summary judgment on various claims.

The district court granted summary judgment to RCT on Count III, holding that the APIs were "produced by an Expression System" within the meaning of the Agreement's definition of "End Product." The court concluded that the phrase "produced by" had a broader meaning than "expressed by," and "include[d] the use of the Expression Technology in the production, manufacture, and development of End Product—not merely the expression of a single protein." Because *Pichia* was used to create CpB, and CpB was in turn "used in the production process" of Lilly's diabetes medications, the court held that the diabetes medications were End Product under the Agreement. The parties settled all of the remaining claims except for Count III, and Lilly timely appealed the adverse judgment as to that count.

**II**

We first address whether Lilly's diabetes medications are "Product" within the meaning of the Agreement.

4

"Indiana courts . . . apply the four-corners rule, which requires that[,] as to any matter expressly covered in the written contract, the provisions therein, if unambiguous, determine the terms of the contract." *Musgrave v. Aluminum Co. of Am., Inc.*, 995 N.E.2d 621, 630 (Ind. Ct. App. 2013) (alteration in original) (quoting *DLZ Ind., LLC v. Greene Cnty.*, 902 N.E.2d 323, 327–28 (Ind. Ct. App. 2009)). We therefore must "begin with the plain language of the contract, reading it in context and, whenever possible, construing it so as to render each word, phrase, and term meaningful, unambiguous, and harmonious with the whole," keeping in mind that "[t]he ultimate goal of any contract interpretation is to determine the intent of the parties at the time that they made the agreement." *Citimortgage, Inc. v. Barabas*, 975 N.E.2d 805, 813 (Ind. 2012).

"Product" is defined as a "pharmaceutical . . . produced by an Expression System." An "Expression System," in turn, is defined as a *Pichia*-based expression system "which directs the production of a Product or Reagent." Because the definition of each term refers to the other term in explaining the relationship between the two terms, the two definitions must be read *in pari materia*. *See* ANTONIN SCALIA & BRYAN GARNER, READING LAW: THE INTERPRETATION OF LEGAL TEXTS § 39 (2012) ("[L]aws dealing with the same subject—being *in pari materia* (translated as 'in a like matter')—should if possible be interpreted harmoniously.") That is, because the two phrases describe the same

5

relationship using the same two defined terms, their descriptions of that relationship must be given the same meaning. Accordingly, a Product is "produced by" an Expression System if the Expression System "directs the production of" that "Product."[2]

This feature of the plain text of the Agreement precludes giving "produced by" the sweeping reading that the district court gave it and that RCT urges in this court. There is no sense in which the *Pichia* expression system "directs the production of a Product." The "Product" is the "pharmaceutical," and the *Pichia* expression system does not "direct" the "production" of a Lilly pharmaceutical, or any of its constituent ingredients, under any ordinary sense of those terms. *See Reuille v. E.E. Brandenberger Constr., Inc.*, 888 N.E.2d 770, 771 (Ind. 2008) (stating that Indiana courts rely on "sources that reflect the ordinary meaning of the term at the time the contract was executed"). In common usage, "production" is "the act or process of producing, bringing forth, or making." *Production*, WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1810 (1986 ed.)

---

[2] Although the definition of "Expression System" also includes a system that "directs the production of a . . . Reagent," the definition of "Product" contains no corresponding reference to "Reagent." By its terms, the definition of "Product" requires that a "pharmaceutical or diagnostic" be "produced by an Expression System," and that language does not include a "pharmaceutical or diagnostic" *produced using a Reagent* that was "produced by an Expression System." Consequently, for purposes of construing the phrase "pharmaceutical or diagnostic . . . produced by an Expression System," the corresponding phrase that is to be read *in pari materia* is an expression system "which directs the production of a Product."

("WEBSTER'S THIRD"); *see also Production*, AMERICAN HERITAGE DICTIONARY 547 (2d ed. 1989) ("AMERICAN HERITAGE") ("[t]he act or process of producing").[3] To "direct" is "to dominate and determine the course of." *Direct*, WEBSTER'S THIRD, *supra*, at 640; *see also Direct*, AMERICAN HERITAGE, *supra*, at 200 ("[t]o conduct the affairs of; manage" or "[t]o take charge of with authority; control"). While *Pichia* may be said to "determine the course" of the "process of bringing forth" CpB, the same cannot be said for any of the pharmaceuticals at issue or any of their ingredients. Because it is undisputed that the "entire sequence of amino acids making up each of Lilly's Diabetes Drugs are expressed by Lilly's *E. coli* expression system, not by [the] *Pichia* expression system," it is clear that the *Pichia* expression system does not "direct[] the production of" the diabetes medications. Those pharmaceuticals are therefore not "produced by" the *Pichia* expression system, and they are thus not "Product" under the Agreement.

Context reinforces this conclusion. The phrases used to define Product and Expression System—*viz.*, "produced by" and "directs the production of"—differ notably from the broader phrases used elsewhere in the Agreement. For example, the phrase "Expression Technology" is defined as "materials *useful in the production of* Product or Reagent" (emphasis added), and "Reagent" is defined as

---

[3] Under Indiana law, courts "generally avoid legal or other specialized dictionaries for such purposes [of determining plain meaning] and turn instead to general-language dictionaries." *Rainbow Realty Grp., Inc. v. Carter*, 131 N.E.3d 168, 174 (Ind. 2019).

"a material produced using the Expression Technology and *which is used in the manufacture or development of Product* or which is used for research purposes" (emphasis added). If the contracting parties had wanted "Product" to include drugs where *Pichia* is "used in the manufacture or development" of a "pharmaceutical" or is "useful in the production of" a "pharmaceutical," they could have employed such phrases in the definition of "Product" and "Expression System," as they did elsewhere in the Agreement. The fact that the contracting parties did *not* use such phrases further confirms that "produced by" and "directs the production of" carry different meanings than "useful in the production of" and "used in the manufacture or development of." *See* SCALIA & GARNER, *supra*, § 25 ("A word or phrase is presumed to bear the same meaning throughout a text; a material variation in terms suggests a variation in meaning.").

RCT argues that CpB is a "Reagent" and that, as a result, the pharmaceuticals are "Product." This contention fails. "Reagent" is defined as "a material [1] produced using the Expression Technology *and* [2] [a] which is used in the manufacture or development of Product or [b] which is used for research purposes" (emphasis added; bracketed numbers and letters added). By its plain terms, the definition of Reagent thus states that, other than for research, the material may only be "used in the manufacture or development of *Product*" (emphasis added). And because the term "Product" is capitalized, its meaning is

8

supplied by the Agreement's definition of "Product," which the definition of Reagent does not alter. Because, for the reasons we have already explained, Lilly's pharmaceuticals are not "Product," any indirect and collateral use of material produced from *Pichia* in the manufacture of those pharmaceuticals does not constitute a "use[] in the manufacture . . . of Product." In short, CpB is not a "Reagent" under the agreement, and the pharmaceuticals are not "Product."

Contrary to what the district court concluded, this reading does not reduce the definition of "Reagent" to surplusage. Under this reading, the Agreement would cover the situation of a Product in which there is a use of the *Pichia* system *both* to direct the production of a pharmaceutical ingredient *and* to produce a "Reagent" that is then used in the manufacture of that Product (without becoming an ingredient). Although that possible category may be narrow, it suffices to ensure that the definition of "Reagent" is not surplusage.

\* \* \*

Given this construction of the Agreement, it may well be that RCT was correct in its alternative contention (in Count I) that the manner in which Lilly used the *Pichia* system was unauthorized and a breach of the Agreement. But the parties have settled that claim, and it is not before us. All that remains is the claim for royalties due for licensed uses under the Agreement (Count III), and for the reasons we have explained, no such royalties were due. We therefore reverse the

9

district court's grant of summary judgment to RCT and remand with instructions to grant summary judgment to Lilly on Count III.

**REVERSED AND REMANDED.**