# FOR PUBLICATION

ATTORNEYS FOR APPELLANTS:

**JAMES P. FIEWEGER**
**ELAINE VULLMAHN**
Williams Montgomery & John, LTD
Chicago, Illinois

**DEBORAH A. KAPITAN**
Kopka Pinkus Dolin & Eads, LLC
Crown Point, Indiana

ATTORNEYS FOR APPELLEE:

**JEFF SHAW**
Ken Nunn Law Office
Bloomington, Indiana

**BRYAN H. BABB**
Bose McKinney & Evans, LLP



FILED
Jan 24 2014, 9:15 am

CLERK
of the supreme court,
court of appeals and
tax court

## IN THE
## COURT OF APPEALS OF INDIANA

SARAL REED and                                )
DURHAM SCHOOL SERVICES, INC.,                 )
                                              )
    Appellants-Defendants,              )
                                              )
        vs.                       )    No.  49A02-1301-CT-9
                                              )
RICHARD BETHEL,                               )
                                              )
    Appellee-Plaintiff.                 )

APPEAL FROM THE MARION SUPERIOR COURT
The Honorable David J. Dreyer, Judge
Cause No. 49D10-1107-CT-26397

**January 24, 2014**

**OPINION – FOR PUBLICATION**

**PYLE, Judge**

## STATEMENT OF THE CASE

Saral Reed ("Reed") and her employer, Durham School Services, Inc. ("Durham"), (collectively, "the Defendants") appeal the $3.9 million judgment entered against them in favor of Richard Bethel ("Bethel") following a jury trial on Bethel's negligence claim against the Defendants. Reed, who was driving a school bus as part of her employment with Durham to provide transportation services for Indianapolis Public School ("IPS"), hit seventeen-year-old Bethel, who was riding his bicycle to school, as the two traveled on West Washington Street in Marion County. On appeal, the Defendants argue that they were denied a fair trial—raising numerous challenges to the admission of evidence and to the conduct of Bethel's counsel during the jury trial—and also challenge the jury's verdict as excessive.

We affirm.

## ISSUES

1.　　Whether the Defendants were deprived of a fair trial.

2.　　Whether the jury's verdict was excessive.

## FACTS[1]

The evidence most favorable to the jury's verdict reveals that in September 2010, Reed was driving a school bus as part of her employment with Durham to provide bus transportation services for IPS. Durham and IPS had entered into a contract ("Durham/IPS contract") for Durham to provide school bus transportation services to IPS for a five-year period from July 1, 2010 to June 30, 2015.

---

[1] We held an oral argument in this case on December 17, 2013, in the Court of Appeals Courtroom in the Indiana Statehouse. We thank counsel for their preparation and presentation.

The Durham/IPS contract, and its unredacted admission of all 117 pages into evidence, is a main challenge of the Defendants in this appeal. The Durham/IPS contract had exhibits attached to it that were incorporated into the contract. For example, the Durham/IPS contract contained an IPS solicitation to contractors who were going to make bids to provide bus service for IPS. This solicitation indicated various terms and requirements of IPS for its bus service. The solicitation had a "Liquidated Damages" provision that provided that IPS would assess a fee for any late bus and could assess a maximum late charge of 400% of the daily bus rate. (Bethel's Ex. 12 at 36). The solicitation also provided that the "successful" contractor would be required to "maintain and pay for all Insurance Requirements outlines in EXHIBIT 14 to these specifications, no exceptions." (Bethel's Ex. 12 at 21). The insurance requirements under Exhibit 14 of the solicitation provided, in relevant part, that a contractor would be required to have $5 million in automobile liability insurance. (*See* Bethel's Ex. 12 at 57). Additionally, the Durham/IPS contract provided that Durham "agreed to deliver a Performance Bond in the amount of five million dollars ($5,000,000)" to IPS. (Bethel's Ex. 12 at 4).

Durham's bus base was located on Belmont Avenue. Reed's bus schedule called for her to check into the bus base at 5:35 a.m. and depart the bus base at 5:45 a.m. Reed's assigned bus route was from the base on Belmont Avenue to Oliver Avenue to Warman Avenue to westbound Washington Street followed by a right turn onto Tibbs Avenue. During that school year, Reed had never deviated from her route. If a driver wanted to deviate from the schedule, Durham policy required that the driver first obtain pre-approval. Reed's bus was equipped with a global positioning system ("GPS").

3

During this time period, seventeen-year-old Bethel was in his junior year at Ben Davis High School. He rode his bicycle to school every day, traveling first to his girlfriend's house before riding to school. Bethel's daily ride included traveling westbound on Washington Street and then making a left turn onto Tibbs Avenue. As part of Bethel's elective classes at Ben Davis, he had signed up for the elective Marine ROTC class during his sophomore year and was taking the class for a second year during his junior year. Bethel had expressed a desire to enlist in the Marines.

On September 15, 2010, the GPS on Reed's bus showed that she started the bus at the bus base at 5:46:38 a.m. and left the bus base at 5:54:16 a.m. The GPS also indicated that at 6:00:05 a.m., Reed turned her bus from Warman Avenue onto the right lane of Washington Street and was going nineteen miles per hour. After Reed turned, she saw a bicyclist, who was Bethel, riding in front of her in the right lane of westbound Washington Street. Bethel was less than thirty feet in front of Reed's bus. Bethel also noticed Reed's bus behind him, but he was accustomed to seeing it traveling in front of him at that time of the morning. Despite the fact that Reed's assigned route called for her to turn right onto Tibbs Avenue, Reed decided to deviate from her route, pass Bethel in the left lane of Washington Street, and continue straight to Lynhurst Avenue, which was 4.5 miles away from Tibbs. Around this same time, Bethel—who knew that Reed's bus usually turned right onto Tibbs Avenue—decided to make his way into the left lane so that he could go left on Tibbs. Bethel looked back, saw Reed's bus approaching but did not see any turn signals on the bus, made a turn motion with left arm, and then moved to the left. Reed, who had accelerated and also moved to the left lane, then hit Bethel. The

4

GPS on Bethel's bus indicated that the collision occurred at 6:00:35, as this was the time that the GPS showed that the bus went to zero miles per hour.

When Reed's bus stopped, Bethel was under the bus, and the bus's tire was on top of Bethel's left foot. Bethel screamed for help. Reed radioed Durham to report that she had "hit a child[.]" (Tr. 211). Reed then got off the bus and saw that Bethel's "body was up under the bus" and that "the tire was on his leg up under the bus[.]" (Tr. 211). Reed then went back into the bus and drove the bus off Bethel's leg. In doing so, Reed ran over Bethel's right leg, which "snapped[.]" (Tr. 439).

An eyewitness, Kimberly Thompson ("Thompson"), who was traveling eastbound on Washington Street, called 911 to report that "there [was] a bus that just hit a bicycle." (Bethel's Ex. 17). An ambulance and police responded to the scene. Reed told the responding EMT that she was traveling thirty to forty miles per hour at the time of the impact.

The ambulance transported Bethel to the hospital in critical condition. Bethel was hospitalized for sixteen days as a result of his injuries. Bethel had a fractured right ankle and a "degloving injury" of his left foot, which meant that "his skin basically was peeled off, almost like you peel an orange." (Bethel's Ex. 6 at 13, 14). The degloving injury required Bethel to have a skin graft, requiring multiple surgeries. He also had to have surgery for his right ankle where doctors attached external hardware to his leg. Bethel also suffered a compression fracture in his thoracic spine and a "major laceration" to his spleen. (Bethel's Ex. 6 at 38). Doctors had to perform an "embolization" surgery to stop the bleeding in Bethel's spleen. (Bethel's Ex. 6 at 20).

5

Durham's general manager, Janet Hoffman ("Hoffman"), and safety supervisor, Itannya Green ("Green"), also went to the collision scene. They then took Reed to have drug testing and retraining that same day, which was Durham's policy when a driver was involved in an accident that was deemed to be "preventable." (Tr. 411). They, however, determined that Reed's accident was "non-preventable." (Tr. 419). At trial, Hoffman testified that they had Reed submit to the testing and training because of "the severity of the accident." (Tr. 353). The day after the collision, Reed filled out a work order, indicating that her turn signals were not working.

Following Bethel's release from the hospital, Bethel had to change the dressings on his wounds. He was also confined to a wheelchair for two to three weeks and had to have physical therapy. Bethel's injuries caused him to miss time from and fall behind at school. One of Bethel's ROTC instructors told Bethel that he would not be able to enlist in the Marine Corp due to his back injury. Bethel's injuries also prevented him from engaging in physical activities as he was accustomed. At trial, a lieutenant colonel from Bethel's ROTC program testified that Bethel had been motivated in the ROTC program. He also testified that prior to the accident, he had no doubts about Bethel's ability to be a good Marine candidate.

On July 11, 2011, Bethel filed a complaint against the Defendants. In his complaint, he alleged that he had received permanent damage as a result of the Defendants' negligence and sought recovery of past and future medical expenses, property damage, lost wages, and "other special expenses[.]" (App. 13). More specifically, Bethel alleged that Reed, who was operating the school bus in the course of

6

her employment with Durham, "negligently drove a school bus, causing a collision with a bicycle ridden by" Bethel and that Durham was "liable for damages to [Bethel] for all negligent acts committed by its employee, Saral Reed, in the course of her employment." (App. 13). In the Defendants' answer, they admitted that Reed drove the bus while in the course of her employment with Durham, and they raised as defenses, among others, that Bethel was at fault and that Reed was faced with a sudden emergency.

A jury trial was held on October 16 through October 19, 2012. On the morning of trial, the trial court granted the Defendants' motion in limine to exclude evidence that the Defendants had liability insurance. Bethel's trial theory was that Reed was running late, was trying to make up time so she would not be disciplined by Durham, and hit Bethel from behind as she was speeding. Bethel's counsel used a David versus Goliath theme to pursue his theory of the case, highlighting the seventeen-year-old kid versus the expert driver and the corporation. The Defendants' defense was that Bethel was at fault by turning his bike directly into the path of Reed's bus and that she was faced with a sudden emergency.

Before opening arguments, the Defendants' counsel informed the trial court of the Defendants' concern that Bethel's counsel would discuss the Durham/IPS contract when questioning Hoffman. The Defendants' attorney stated that the contract had "nothing to do with the price of tea in China" for this negligence/respondeat superior case. (Tr. 116). Bethel's counsel argued that the contract "call[ed] for money back guarantees when a driver is late" and that it was relevant to Bethel's trial theory because he was arguing that Reed's driving choices were motivated by the risk of incurring late fees. (Tr. 117). The

7

trial court deferred making a pre-witness ruling but indicated that it could see potential relevance.

During the first day of trial, Reed testified that she did not follow the Durham manual's directive that provided that "[b]uses will travel in the right lane at all times except when a hazard exists or preparing to turn left." (Bethel's Ex. 1 at 82). Reed also testified that she was aware that a driver could be disciplined by Durham for being late. Additionally, she testified that she could have slowed down and stayed in the right lane and taken her normal route that day.

At the end of the first day and outside the presence of the jury, the Defendants told the trial court that they were going to object to Bethel's admission of the 911 recording because he had failed to list it on his exhibit list and because they did not have a copy. Bethel's counsel gave the Defendants' counsel the original 911 recording to review, and the trial court deferred any ruling on the admission of the recording.

The following day, Bethel's first witness was Thompson, who was an eyewitness who called 911. Prior to her testimony, and outside the presence of the jury, the parties discussed the recording, and the trial court indicated that Bethel could possibly use the recording to refresh Thompson's memory. During Thompson's direct examination, she did not need her memory refreshed. Thompson testified that she saw both the bus and the bike changing lanes at the same time just before the collision.

When cross-examining Thompson, the Defendants' counsel impeached Thompson's trial testimony regarding the vehicles' lane changes with her previous statement to the responding police officer in which she indicated that she saw the bus

8

change lanes and then saw that the bicycle "darted in front of the bus." (Tr. 277). The Defendants' counsel also impeached Thompson's testimony with her prior recorded statement to Durham's insurance adjuster. The Defendants' counsel asked Thompson if she remembered giving a recorded statement to "a gentlemen [sic] on the telephone." (Tr. 278). Bethel's counsel asked to voir dire Thompson and established that the gentleman was an insurance adjuster. The Defendants objected, contending that they did not identify the person. The trial court stated that "once you start doing it he's entitled to ask who it is." (Tr. 280).

Also that second day of trial, Bethel called Hoffman as a witness. Hoffman testified that part of her duties as general manager was to enforce the Durham/IPS contract. Hoffman also testified that Durham could incur a late fee if a bus driver was late on his or her route. When Bethel asked Hoffman how much the fee was, the Defendants objected based on relevancy and being beyond respondeat superior. The trial court overruled the objection. Hoffman testified that she did not remember the fee but that it accrued by the minute and could go over the route amount. Bethel then asked Hoffman if the fee could go up to 400% of the route amount if a bus was fifteen minutes late, and Hoffman responded, "According to the contract?" (Tr. 334). The Defendants objected that the question was beyond respondeat superior and that there was no evidence that Reed was late. The trial court overruled the objection. Hoffman then testified that the 400% late fee could affect a driver's ability to calculate risks.

Bethel did not move to admit the Durham/IPS contract during Hoffman's testimony. The following day before any witnesses were called, Bethel asked the trial

9

court to take care of some evidentiary matters, including the admission of the Durham/IPS contract (Bethel's Exhibit 12). The Defendants objected based on relevancy, arguing that "maybe 1 page of . . . 170" pages[2] of the exhibit was relevant. (Tr. 464). The trial court stated that, due to Bethel's trial theory that Reed's actions were affected by the motivation not to "get this penalty," there was "a relevance to show some corporate information" about "how it operates." (Tr. 464). The trial court indicated, however, that all of the contract may not be relevant. Bethel's counsel offered that he would "redact it if they want" and would take the "pages showing the route figures, the penalty figures – the determination of whether it's late or not[.]" (Tr. 465). The trial judge responded that they could "hold that" but that he would admit the relevant portions of it. (Tr. 465). The trial judge also stated that he was "not so sure it's all harmless you know the relatively noninvolved parts of it[.]" (Tr. 465). The record does not reveal that the parties ever discussed Exhibit 12 again, and it was admitted without redaction.

Bethel presented evidence regarding his injuries from himself and from the deposition testimony of Dr. Clark Simons ("Dr. Simons"), Bethel's treating doctor at the hospital. When Bethel introduced twenty-five photographs of his injuries (Bethel's Exhibit 14), the Defendants objected based on some of the photos being cumulative. The trial court overruled the objection and admitted all the photographs. Bethel also testified that he experienced daily pain in his back and his ankle, requiring him to take pain medication.

---

[2] The Durham/IPS contract actually consisted of 117 pages.

10

After Bethel rested, the Defendants presented an expert witness, Michael O'Hern ("O'Hern"), who was an accident reconstruction specialist. He testified that he had reviewed the depositions of Bethel, Reed, and Thompson, and he opined that Bethel's bike made a forty-five degree angle turn in front of Reed's bus and that it was a "side swipe type of impact." (Tr. 607). O'Hern testified that his opinion was consistent with the reviewed testimony that Bethel cut in front of the bus. On cross-examination, Bethel attempted to challenge O'Hern on his statement regarding Thompson's testimony that Bethel cut in front of the bus by pointing out Thompson's trial testimony that both vehicles moved simultaneously. O'Hern responded that Thompson's testimony was consistent with her original statement that the bus had already moved to the left lane before the bike cut in front of it.

After the Defendants rested their case, Bethel requested to play the 911 recording as rebuttal evidence. Bethel's counsel stated that he wanted to rebut Thompson's cross-examination testimony that Bethel darted in front of the bus and rebut O'Hern's testimony where he commented on the content of Thompson's testimony. The Defendants objected, arguing that Bethel was not allowed to rebut his own case. The trial court overruled the objection and allowed the rebuttal evidence. Specifically, the trial court ruled that Bethel could rebut the "cross examination testimony of that witness" who the trial court considered a hostile witness "in an informal way." (Tr. 690).

The parties stipulated that Bethel had medical bills totaling $193,365.15 with $61,237.89 being the amount that was paid. During closing arguments, Bethel's counsel asked the jury to award $35 million for past, present, and future pain and suffering and to

11

award him $1.00 for the loss of his dream of becoming a Marine.[3] Bethel's counsel continued his David versus Goliath tone in his closing argument, making various references to the corporation such as the corporate attorneys and a corporate verdict. The Defendants did not object to Bethel's closing argument.

The trial court instructed the jury that they were required to decide the case based on negligence and comparative fault. The trial court also instructed the jury on the Defendants' defense of sudden emergency. Additionally, the trial court instructed the jury that if they determined that Reed was liable to Bethel, they could consider various factors—including the nature and extent of Bethel's injuries, the permanency of his injuries, his past and future physical pain, and the reasonable value of his past and future medical care and treatment—when deciding the amount of money to award to compensate Bethel. Finally, the trial court instructed the jury that they "must not permit sympathy, prejudice, or other emotions to sway [them]" and that they were required to determine their verdict from "the facts as [they] f[ou]nd them to be from the evidence" and from the law given to them by the trial court. (App. 41).

The jury deliberated over two days—six hours on the first day and into the afternoon on the second day—and returned a verdict in favor of Bethel and against the Defendants. Specifically, the jury determined that the Defendants were seventy-five percent (75%) at fault, Bethel was twenty-five percent (25%) at fault, and that Bethel's

---

[3] Specifically, Bethel's counsel asked the jury to award $3 million for Bethel's spleen damage and surgery; $5 million for being "near death[;]" $5 million for having "five major surgeries[;]" $5 million for scarring; and the remaining amount for pain and suffering, which included being literally and figuratively "thrown under the bus" by the Defendants saying that Bethel was to blame for the collision. (Tr. 718).

total damages were $5,200,001.00. Thus, the trial court entered judgment in favor of Bethel and against the Defendants in the amount of $3,900.000.75.

The Defendants filed a motion to correct error, arguing that the jury's award of $5 million was "excessive" and a "runaway verdict" and contending that it was unsupported by the weight of the evidence. (App. 63). The Defendants also alleged that they were prejudiced by the alleged erroneous admission of the Durham/IPS contract into evidence, the lack of instruction on the basis of Durham's liability, and the lack of sufficient evidence of Bethel's injuries. The Defendants requested the trial court to either grant a new trial pursuant to Indiana Trial Rule 59(J) or to reduce the jury's verdict to $600,000.00. The trial court denied the Defendants' motion, specifically concluding that "[n]o prejudicial or harmful error ha[d] been committed regarding the judgment." (App. 11). The Defendants now appeal. Further facts will be provided below as necessary.

DECISION

The Defendants appeal following the denial of their motion to correct error, in which they sought a new trial or a reduction of the verdict. We generally review a trial court's ruling on a motion to correct error for an abuse of discretion. *Speedway SuperAmerica, LLC v. Holmes*, 885 N.E.2d 1265, 1270 (Ind. 2008), *reh'g denied*.

The Defendants raise two general arguments in this appeal. Specifically, they contend that: (1) they were denied a fair trial due to the trial court's rulings regarding admission of evidence and due to Bethel's counsel's conduct during trial; and (2) the jury's verdict was excessive.

1.    Fair Trial

13

The Defendants' fair trial argument is multi-faceted. They contend that they were "deprived of a fair trial due to improper admission of evidence, unfair trial tactics, and cumulative error." (Defendants' Br. 14). Each of these arguments is somewhat interwoven, but they will be discussed separately in this opinion.

A.    *Admission of Evidence*

In regard to the admission of evidence, the Defendants contend they were "deprived of a fair trial because of erroneous evidentiary rulings, which allowed Bethel to incite the jury's prejudice against defendants and sympathy for him." (Defendants' Br. 40). The Defendants contend that the trial court erred by admitting the following evidence during the jury trial: (1) the Durham/IPS contract (Bethel's Exhibit 12); (2) photographs of Bethel's injuries (Bethel's Exhibit 14); and (3) the 911 recording (Bethel's Exhibit 17).

The admission and exclusion of evidence falls within the sound discretion of the trial court, and we review the admission of evidence only for an abuse of discretion. *Estate of Carter v. Szymczak*, 951 N.E.2d 1, 5 (Ind. Ct. App. 2011), *trans. denied*. An abuse of discretion occurs when the trial court's decision is clearly against the logic and effect of the facts and circumstances before it. *Id.* This Court will not reverse the trial court's admission of evidence absent a showing of prejudice. *Id.*

In order to preserve an appellate argument challenging the admission of evidence, a party must have made a contemporaneous objection at trial, and the failure to object will result in waiver of any alleged error. *Raess v. Doescher*, 883 N.E.2d 790, 796 (Ind. 2008), *reh'g denied*. In addition to a timely objection, the objection must also state the

14

"'specific ground'" for the objection "'if the specific ground was not apparent from the context.'" *Id.* at 797 (quoting Ind. Evidence Rule 103(a)(1)). In other words, "[t]o preserve a claimed error in the admission of evidence, a party must make a contemporaneous objection 'that is sufficiently specific to alert the trial judge fully of the legal issue.'" *Id.* (quoting *Moore v. State*, 669 N.E.2d 733, 742 (Ind. 1996), *reh'g denied*). Moreover, "[i]t is well established that '[a] party may not object on one ground at trial and seek reversal on appeal using a different ground.'" *Musgrave v. Aluminum Co. of Am., Inc.*, 995 N.E.2d 621, 638-39 (Ind. Ct. App. 2013) (quoting *Malone v. State*, 700 N.E.2d 780, 784 (Ind. 1998) and citing *Showalter v. Town of Thorntown*, 902 N.E.2d 338, 342 (Ind. Ct. App. 2009) (stating that the trial court "cannot be found to have erred as to an issue or argument that it never had an opportunity to consider"), *trans. denied*). Thus, "[a] mere general objection, or an objection on grounds other than those raised on appeal, is ineffective to preserve an issue for appellate review." *Raess*, 883 N.E.2d at 797.

### (1) *Durham/IPS Contract*

The Defendants contend that the trial court should not have admitted the Durham/IPS contract because it was "irrelevant" and "prejudicial." (Defendants' Br. 15). Specifically, they argue that the contract was irrelevant and prejudicial because: (a) "it set forth a liquidated damage provision for late buses;" and (2) it "included many references to bond and insurance requirements of $5 million each." (Defendants' Br. 15).

#### (a) *Late Fee*

Under this argument, the Defendants argue that both testimony and the contract provision regarding the liquidated damages or late fees should not have been admitted into evidence because it was irrelevant and prejudicial. At trial, however, the Defendants objected to the admission of the Durham/IPS contract based on relevancy and did not make a specific objection that it was prejudicial. Thus, they have waived any argument that the admission of the contract was prejudicial. *See Raess*, 883 N.E.2d at 797 (explaining that "[a] mere general objection, or an objection on grounds other than those raised on appeal, is ineffective to preserve an issue for appellate review").

Turning to the Defendants' relevancy argument, we note that Indiana Evidence Rule 401 provides that evidence is relevant if it has "any tendency" to make a fact "that is of consequence in determining the action" more or less probable than it would be without the evidence. Relevant evidence is generally admissible. *See* Ind. Evid. R. 402.

The Defendants acknowledge that the trial court overruled their relevancy objections to Bethel's questions to Hoffman regarding the late fee provision contained in the Durham/IPS contract. They also recognize that Bethel's theory at trial was that Reed was running late on the day of the accident. Nevertheless, they argue that the trial court should have sustained their relevancy objections to Hoffman's testimony and should have excluded the Durham/IPS contract from evidence, contending that the late fee provision was irrelevant. They argue that the late fee evidence and the admission of the Durham/IPS contract was beyond the scope of negligence and respondeat superior and misled the jury to believe that this case was a negligent hiring/supervision case. They

16

also argue that the Durham/IPS contract late fee provision was not relevant and was erroneously admitted without redaction despite Bethel's counsel's offer to redact.

Bethel argues that the late fee evidence was both relevant and vital to explaining Reed's motivation for speeding up and changing lanes to pass Bethel and changing her route, which she admitted was contrary to the company's policy. Bethel contends that the trial court "well understood why this evidence was relevant and admissible." (Bethel's Br. 12). Bethel also argues that even "Reed" agreed that the late fee provision could affect the decisions that a driver makes. (Bethel's Br. 12).[4] Additionally, Bethel contends that the Defendants have waived their argument regarding the admission of an unredacted version of the Durham/IPS contract because Bethel agreed to redact the contract as the Defendants wanted but they did not inform the trial court what they wanted redacted.

Here, the Defendants made a relevancy objection to the admission of the Durham/IPS contract, arguing that "maybe 1 page" of the one hundred plus pages of the contract was relevant. (Tr. 464). The trial court overruled the Defendants' relevancy objection. The trial court determined that, due to Bethel's trial theory that Reed's actions were affected by the motivation not to "get this penalty," there was "a relevance to show some corporate information" about "how it operates." (Tr. 464). The trial court,

---

[4] In the Defendants' Reply Brief, they point out that Bethel, on page twelve of his Appellee's Brief, erroneously attributed testimony to Reed in his argument regarding the admissibility of evidence of the late fee provision in the Durham/IPS contract. Bethel used his response to the Defendants' motion for oral argument to acknowledge and apologize for the "honest mistake." (*See* Response to Appellants' Motion for Oral Argument at 1). Bethel indicated that page twelve of his Appellee's Brief should have stated that the testimony was from Hoffman, not Reed. Bethel, however, has neither filed a separate motion seeking to amend his Appellee's Brief to correct this error nor tendered a corrected brief. Thus, the error remains in his brief. If Bethel would like to correctly remedy the error in his brief, we encourage him to do so through our appellate motions practice. *See* Ind. App. R. 34(A).

17

however, indicated that all of the contract may not be relevant. Bethel's counsel offered that he would "redact it if they want" and would take the "pages showing the route figures, the penalty figures – the determination of whether it's late or not[.]" (Tr. 465). The trial court responded that they could "hold that" but that he would admit the relevant portions of it. (Tr. 465). The trial judge also stated that he was "not so sure it's all harmless you know the relatively noninvolved parts of it[.]" (Tr. 465). The record does not reveal that the parties ever discussed Exhibit 12 again, and it was admitted without redaction.

In their Reply Brief, the Defendants argue that their objection that only one page of one hundred plus page exhibit was relevant was sufficient to advise Bethel and the trial court what they wanted redacted. We cannot agree that such a general objection was sufficient. *See Raess*, 883 N.E.2d at 797. Indeed, at oral argument, the Defendants acknowledged that they did not make a redaction request before the exhibits were sent back to the jury for deliberations. The Defendants fail to show how the trial court's ruling on relevancy and the admission of the contract was an abuse of discretion. Accordingly, we affirm the trial court's admission of the Bethel's Exhibit 12 into evidence.

### (b) *Insurance and Bond*

The Defendants also argue that the Durham/IPS contract was inadmissible because it contained "prejudicial" references to the requirement that Durham have a $5 million automobile liability insurance and performance bond. The Defendants point out that "[t]he Indiana Supreme Court 'has long held that evidence of a defendant's insurance is

not competent in a personal injury action and its admission is prejudicial.'" (Defendants' Br. 20) (quoting *Raush v. Reinhold*, 716 N.E.2d 993, 1002 (Ind. Ct. App. 1999), *trans. denied*). They also rely on Indiana Evidence Rule 411, which provides:

> Evidence that a person was or was not insured against liability is not admissible to prove whether the person acted negligently or otherwise wrongfully. But the court may admit this evidence for another purpose, such as proving a witness's bias or prejudice or proving agency, ownership, or control.

Thus, the Defendants argue that admission of the Durham/IPS contract with the insurance references was therefore prejudicial.

As discussed above, the Defendants objected to the admission of the Durham/IPS contract based on relevancy and did not make a specific objection that it was prejudicial. Accordingly, the Defendants have waived any argument that the admission of the contract was prejudicial.[5] *See Raess*, 883 N.E.2d at 797.

### (2) *Photographs of Injuries*

The Defendants next argue that the trial court erred by admitting Bethel's Exhibit 14, which consisted of twenty-five photographs of Bethel's injuries taken during the course of his sixteen-day hospitalization. The Defendants do not argue that specific photographs should have been excluded. Instead, the Defendants generally contend that these photographs should not have been admitted because they were "excessive[ly]

---

[5] In their Reply Brief, the Defendants argue that "Bethel offering the document into evidence with the insurance information intact violated the order *in limine* precluding plaintiffs from introducing evidence of liability insurance." (Defendants' Reply Br. 8). The Defendants neither made this argument at trial nor in their Appellants' Brief. Thus, this argument is waived. *See, e.g., Felsher v. University of Evansville*, 755 N.E.2d 589, 593 n. 6 (Ind. 2001) (holding that an argument was waived because it was raised for the first time in the reply brief); *see also* Ind. App. R. 46(C) ("No new issues shall be raised in the reply brief.").

19

gruesome[,]" "misleading[,]" and "prejudicial." (Defendants' Br. 27). The Defendants cite to Evidence Rule 403 to argue that evidence should be excluded if it is unfairly prejudicial, leads to confusion of the issues, or results in the needless presentation of cumulative evidence. The Defendants argue that the photographs were misleading because they emphasized the early stages of Bethel's injuries and "suggested that the photographs depicted the final appearance of his foot and leg." (Defendants' Br. 28).

At trial, the Defendants did not object to the photographs on these grounds and did not specifically refer to Evidence Rule 403 as a basis for excluding the photos from evidence. Instead, the Defendants objected based on some of the photographs as being "cumulative" of each other. (Tr. 444). Specifically, the Defendants' counsel focused on the number of the photographs and stated: "We're not arguing no pictures go in[,] what we're saying is don't need 5 pictures of the same foot in the graph stage." (Tr. 444). Because the Defendants did not object at trial to the photographs as being gruesome or prejudicial, they cannot raise an appellate argument challenging the admission of the photographs on these grounds. *See Musgrave*, 995 N.E.2d at 638-39 (explaining that a party may not object on one ground at trial and seek reversal on appeal using a different ground).

### (3) *911 Recording*

The Defendants also argue that the trial court erroneously admitted Bethel's Exhibit 17, the recording of the 911 calls made by various people, including Thompson, at the accident scene. Specifically, the Defendants contend that the use of the 911 recording was improper rebuttal because Bethel used it to rebut his own witness's

(Thompson's) testimony regarding how the collision occurred and whether Bethel turned in front of the bus.[6]

The Defendants do not offer any specific argument how or why it was an abuse of discretion for the trial court to allow the 911 recording as rebuttal evidence. Instead, they generally contend—as they did to the trial court—that Bethel should not have been allowed to rebut his "own case." (Tr. 689). To support this argument they rely on the 1909 case of *Gray v. Good*, 44 Ind. App. 476, 89 N.E. 498 (1909), which provides that "[w]hile a party has the right to impeach his own witness by contradictory statements made out of court, having introduced the witness himself, it is essential that, if he desires to affect or less the value of the testimony he has given, he should do so before closing his case." The Defendants also cite to Indiana Trial Rule 43(D), which provides that "the party on whom rests the burden of the issues must first produce his evidence thereon; the adverse party will then produce his evidence which may then be rebutted."

In response, Bethel asserts that the Defendants have waived review of their challenge to the admission of the 911 recording because they did not raise a specific enough objection and did not adequately explain their objection so as "'to alert the trial judge fully of the legal issue.'" (Bethel's Br. 19) (quoting *Raess*, 883 N.E.2d at 797).

_____

[6] The Defendants also argue that the 911 recording was prejudicial, asserting that Bethel cried when he heard the recording. The Defendants acknowledge, however, that "the transcript does not specifically reflect the fact of Bethel crying[.]" (Defendants' Br. 25). Aside from the fact that the transcript contains no specific indication that Bethel cried, the fact is that the Defendants did not object to the admission of the 911 recording based on prejudice. Because the Defendants did not object at trial to the photographs as being gruesome or prejudicial, they cannot raise an appellate argument challenging the admission of the photographs on these grounds. *See Musgrave*, 995 N.E.2d at 638-39 (explaining that a party may not object on one ground at trial and seek reversal on appeal using a different ground).

21

Bethel also argues that the Defendants never objected based on Trial Rule 43(D). Bethel contends that, waiver notwithstanding, the 911 recording was properly admitted as rebuttal evidence to both: (1) the Defendants' cross-examination of Thompson; and (2) the Defendant's expert witness O'Hern's testimony that Bethel darted out in front of the bus. Bethel contends that the recording was proper rebuttal evidence because it met the purpose of rebuttal evidence and tended to explain, contradict, or disprove the evidence offered by the Defendants.

"Rebuttal evidence is that which tends to explain, contradict, or disprove an adversary's evidence." *Hatter v. Pierce Mfg., Inc.*, 934 N.E.2d 1160, 1174-75 (Ind. Ct. App. 2010) (citing *White v. White*, 655 N.E.2d 523, 529 (Ind. Ct. App. 1995)), *trans. denied*. *See also Morgen v. Ford Motor Co.*, 797 N.E.2d 1146, 1152 (Ind. 2003), *reh'g denied*. The scope of rebuttal and the order of evidence are matters left to the discretion of the trial court. *See Hatter*, 934 N.E.2d at 1174-75; *see also* Trial Rule 43(D) (explaining that a trial court has discretion to determine the order of evidence presented). While a trial court may exclude testimony offered in rebuttal that should have been presented in the party's case-in-chief, such a decision is left to the sound discretion of the trial court. *Morgen*, 797 N.E.2d at 1152. Therefore, inversely, the admission of evidence during rebuttal that could have been presented in a party's case-in-chief is a decision left to the sound discretion of the trial court. *See id.*; *see also State Farm Mut. Auto. Insur. Co. v. Shuman*, 370 N.E.2d 941, 952 (Ind. Ct. App. 1977) (explaining that "[t]o warrant reversal for the admission of evidence out of its proper order, even for the admission of rebuttal evidence which should have been presented in plaintiff's case in chief, there must

22

be an abuse of the trial court's discretion tending to defeat the ends of justice). We review the trial court's admission of rebuttal evidence for an abuse of discretion. *Morgen*, 797 N.E.2d at 1152.

Here, Bethel requested to play the 911 recording to rebut Thompson's cross-examination testimony that Bethel darted in front of the bus and rebut O'Hern's testimony where he commented on the content of Thompson's testimony. The Defendants objected, arguing that Bethel was not allowed to rebut his "own case." (Tr. 689). In other words, the Defendants contended that Bethel should not be allowed to use the recording to rebut his own witness's (Thompson's) testimony. The Defendants did not make any specific objection to the use of the recording to rebut O'Hern's testimony. The trial court overruled the objection and allowed the rebuttal evidence because it explained the witnesses' testimony regarding darting versus merging. Specifically, the trial court ruled:

> . . . I'm going to allow his rebuttal, the cross examination testimony of that witness, and it was a hostile witness I think, but I'm not ruling hostile witness, but hostile in an informal way. And I do think you can do that, and I think that you can rebut any evidence [be]cause rebuttal means you have to just try, you get the last word of maintaining a burden of proof, and this issue of darting versus merging is part of a fair cross examination.

(Tr. 689-90).

The Defendants fail to show how the trial court abused its discretion by allowing Bethel to present the 911 recording to rebut the combination of Thompson's testimony and O'Hern's testimony. Based on our review of the record, and under the specific

23

circumstances presented as part of this trial, we cannot say that the trial court abused its discretion by allowing Bethel to introduce the rebuttal evidence.

### B. *Unfair Trial Tactics*

The Defendants' argument regarding unfair trial tactics contains multiple parts or challenges. The Defendants spend the majority of this argument arguing that Bethel's closing argument was improper.[7] In particular, they contend that Bethel's closing argument was prejudicial because it contained references to Durham as a corporation, including references to the Defendants' attorneys as corporate attorneys and getting a corporate verdict. They argue that Bethel's closing argument "sounded like an argument by a party seeking punitive damages against a corporate defendant for corporate bad acts." (Defendants' Br. 23). They also challenge Bethel's counsel's argument requesting the jury to award $1 for Bethel's lost dream of becoming a Marine.

The Defendants, however, admit that they failed to object to Bethel's closing argument. (*See* Defendants' Br. 24). Our Indiana Supreme Court has explained that "[t]o seek appellate relief based on alleged improprieties in a closing argument, a party 'must promptly interpose and state its objection to the language or argument and request the court to so instruct the jury as to counteract any harmful effect of such language or

---

[7] Under this argument, the Defendants also bring a new twist to their previous argument that the trial court erred by allowing Bethel to question Hoffman about Durham's corporate conduct and practices. This time, they challenge Bethel's questions to Hoffman about when Reed was hired by Durham. At trial, the Defendants objected to such questions as not being relevant to respondeat superior. On appeal, they argue that these questions and responses were prejudicial, contending that the "jury was confused" by the testimony and that it "improperly suggested to the jury that 'corporate' negligence was at issue." (Defendants' Br. 22, 23). Because the Defendants did not object at trial to this testimony as being prejudicial, they cannot raise an appellate argument challenging the admission of the testimony on these grounds. *See Musgrave*, 995 N.E.2d at 638-39 (explaining that a party may not object on one ground at trial and seek reversal on appeal using a different ground).

argument.'" *Paragon Family Rest. v. Bartolini*, 799 N.E.2d 1048, 1056-57 (Ind. 2003) (quoting *Ritter v. Stanton*, 745 N.E.2d 828, 856 (Ind. Ct. App. 2001), *trans denied*, *cert. denied*). Because the Defendants failed to object to Bethel's closing argument, they have waived any appellate argument challenging the propriety of Bethel's closing argument. *See id.*

C. *Cumulative Error*

The Defendants argue that "[w]hen all the errors are viewed together, it is clear that defendants did not receive a fair trial." (Defendants' Br. 30). In addition to the previously alleged errors in the admission of evidence, the Defendants also contend that "Bethel's counsel defied the rules of proper trial advocacy in his closing argument." (Defendants' Br. 29). They contend that Bethel's counsel "prejudiced the jury against Durham and evoked sympathy for Bethel." (Defendants' Br. 30). The Defendants contend that all the alleged errors "worked together to cause the jury to prejudicially view defendants as a greedy, immoral corporate entity who care more about profits than the children it was transporting." (Defendants' Br. 30).

We cannot agree that there was cumulative error or a showing that the jury was prejudiced against the Defendants. We first note that the Defendants did not object to Bethel's closing argument; therefore, they have waived any challenge that his argument was improper. *See Paragon Family Rest.*, 799 N.E.2d at 1056-57. Additionally, as explained above, we find no error in the admission of evidence claims raised by the Defendants. Finally, the trial court instructed the jury that they "must not permit sympathy, prejudice, or other emotions to sway [them]" and that they were required to

25

determine their verdict from "the facts as [they] f[ou]nd them to be from the evidence" and from the law given to them by the trial court. (App. 41). Therefore, we conclude that there was no cumulative error.

2.      Verdict

Lastly, the Defendants challenge the jury's verdict awarding $3.9 million in damages to Bethel. The Defendants assert that that the jury's verdict was excessive and was the result of an improper consideration. The Defendants request this Court to reverse the trial court's denial of his motion to correct error, to vacate the judgment, remand for a new trial on all issues. Alternatively, the Defendants seek a remand for a new trial on damages.

A person injured by the negligence of another is entitled to "reasonable compensation," which is the "sum [that] would reasonably compensate the victim both for bodily injuries and for pain and suffering." *Ritter*, 745 N.E.2d at 843. We apply a "strict standard" when we review an appellate claim that a jury's damages award was excessive. *Id.* "A jury's determination of damages is entitled to great deference when challenged on appeal." *Sears Roebuck and Co. v. Manuilov*, 742 N.E.2d 453, 462 (Ind. 2001).

> Damages are particularly a jury determination. Appellate courts will not substitute their idea of a proper damage award for that of the jury. Instead, the court will look only to the evidence and inferences therefrom which support the jury's verdict. We will not deem a verdict to be the result of improper considerations unless it cannot be explained on any other reasonable ground. Thus, if there is any evidence in the record which supports the amount of the award, even if it is variable or conflicting, the award will not be disturbed.

26

*Id.* (quoting *Prange v. Martin*, 629 N.E.2d 915, 922 (Ind. Ct. App. 1994), *reh'g denied*, *trans. denied*). When considering a claim of an excessive jury verdict, we neither reweigh the evidence, and we "look only to the evidence and the reasonable inferences therefrom which uphold the verdict." *Lutheran Hosp. of Indiana, Inc. v. Blaser*, 634 N.E.2d 864, 873 (Ind. Ct. App. 1994), *reh'g denied*. "To warrant reversal, the award 'must appear to be so outrageous as to impress the Court at "first blush" with its enormity.'" *Ritter*, 745 N.E.2d at 844 (quoting *Kimberlin v. DeLong*, 637 N.E.2d 121, 129 (Ind. 1994) (quoting *New York Cent. R.R. Co. v. Johnson*, 234 Ind. 457, 127 N.E.2d 603 (1955)), *reh'g denied*, *cert. denied*).

The Defendants initially argue that the verdict was the result of the "improper consideration" of liability insurance. (Defendants' Br. 31). Relying on *TRW Vehicle Safety Systems, Inc. v. Moore*, 936 N.E.2d 201 (Ind. 2010), the Defendants assert that there is a "remarkable congruence" between the jury's damages award and the amount of liability insurance and contend that this Court "should find that the amount of the award is proof of the prejudicial effect of the improper evidence." (Defendants' Br. 33).

In *TRW*, the Indiana Supreme Court reversed a jury's verdict for damages under Indiana's Wrongful Death Act where the Court determined that the verdict was based on an "improper consideration" and could not "be explained on any other reasonable ground." *TRW*, 936 N.E.2d at 224. Specifically, the Court determined that there was a strong implication that the jury followed the plaintiff's attorney's request that the jury calculate damages for the decedent's dependent based on the projected remainder of the decedent's life expectancy instead of following the Wrongful Death Act and the trial

27

court's instructions that the damages should be based on the period of the dependent son's dependency. *Id.* at 223-24. The *TRW* Court explained that it is usually "difficult, if not impossible, to ascertain the particular component amounts that comprise a jury's opaque general verdict." *Id.* at 223. However, due to the "remarkable congruence" between the jury's damage determination and the plaintiff's attorney's damages request, the Court determined that this case represented a "rare exception" to that difficulty in determining the considerations of the jury. *Id.*

Unlike the jury in *TRW*, here it is clear that the jury here did not follow Bethel's counsel's request regarding the calculation of damages, where counsel asked the jury to award Bethel $35 million in damages. Likewise, the jury did not disregard the trial court's instructions. The trial court instructed the jury that if they determined that Reed was liable to Bethel, they could consider the following when deciding the amount of money to award to compensate Bethel:

(1)   the nature and extent of the injury, and the effect of the injury on Richard Bethel's ability to function as a whole person;

(2)   whether the injury is temporary or permanent;

(3)   the physical pain Richard Bethel has experienced and will experience in the future as a result of the injuries;

(4)   the reasonable value of necessary medical care, treatment, and services [Bethel] incurred and will incur in the future as a result of the injuries[.]

(App. 56). When returning a verdict in favor of Bethel, the jury determined Bethel's total damages were over $5 million. The jury determined that Reed was 75% and Bethel was 25% at fault, resulting in a damages award of $3.9 million to Bethel. This reduction

in the verdict to reflect Bethel's comparative fault suggests that the jury did not award damages based solely on the improper consideration of liability insurance. Instead, such a reduction "indicates to us that the jury exercised its discretion to evaluate and weigh the evidence to reach a conclusion regarding damages." *Ritter*, 745 N.E.2d at 857. Furthermore, while information regarding insurance should not have been admitted into evidence at trial, *see Hull v. Taylor*, 644 N.E.2d 622, 626 (Ind. Ct. App. 1994), the Defendants are in a poor position to argue that the jury improperly considered the existence of liability insurance where they failed to specifically object to the admission of the insurance information. Because the jury's verdict can be explained on other reasonable grounds, we will not deem it to be a result of improper considerations. *See Ritter*, 745 N.E.2d at 857 (explaining that a jury's award of damages will not be considered to be the result of improper considerations where the award can be explained on any reasonable ground).

The Defendants also argue that the jury's damages verdict was a "runaway verdict not within the scope of evidence." (Defendants' Br. 31). The Defendants concede that Bethel suffered serious injuries as a result of the collision but maintain that the evidence was "insufficient to support such an extraordinary award." (Defendants' Br. 35). The Defendants assert that Bethel failed to introduce "evidence of any permanent impairment, any need for further medical treatment, and any actual current or permanent scarring." (Defendants' Br. 35). The Defendants acknowledge that Bethel presented evidence that he would be permanently scarred from his degloving injury and skin grafts but contend that this evidence of scarring was insufficient because Bethel did not show the jury his

29

scars at trial or present any videos or photographs of the current state of his scars. The Defendants also acknowledge that Bethel testified that he was experiencing pain in his back and ankle but contend that this evidence was not compelling because Bethel was able to sit through the multi-day jury trial and "did not limp or use any assistive walking devices." (Defendants' Br. 38).

Bethel counters that the "record is replete with evidence of devastating injuries, unspeakable pain and suffering," and loss, including " the loss of an opportunity to seek a waiver to be a United States Marine, the loss of an opportunity to graduate with his high school class, and the loss of ability to participate in physical activity." (Bethel's Br. 26).

Here, the evidence at trial reveals that Bethel suffered severe injuries and pain as a result of Reed hitting him with the bus. Bethel was initially trapped under the bus until Reed moved the bus and ran over him a second time. Bethel suffered fractures to his spine and right ankle, a spleen laceration, and a degloving injury to his left foot. Bethel presented evidence regarding his sixteen-day hospital stay, which included multiple surgeries and skin grafts. Bethel also presented evidence that he was in good physical condition before the collision and that he was limited in his ability to perform physical activities (such as baseball, football, running, and soccer) after the collision. Additionally, Bethel testified that he experienced daily pain in his back and right ankle from his fractures and that he had to take prescription pain medication to control the pain.

The Defendants' challenge to the jury's damages verdict seems to be that the jury assigned too high a value on what it would take to compensate Bethel for his injuries and pain and suffering. This challenge is nothing more than a request to reweigh the

30

evidence, which we will not do. *See Lutheran Hosp.*, 634 N.E.2d at 873. Because there is evidence in the record to support the jury's damages award, we will not disturb the award on appeal.

Affirmed.

CRONE, J., and BARNES, J., concur.