## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



**FILED**

Jul 17 2018, 9:00 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Kristin A. Mulholland
Crown Point, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General of Indiana

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Charles A. McMichael, Jr., <br> *Appellant-Defendant,* <br><br> v. <br><br> State of Indiana, <br> *Appellee-Plaintiff.* | July 17, 2018 <br><br> Court of Appeals Case No. 18A-CR-394 <br><br> Appeal from the Lake Superior Court <br><br> The Honorable Salvador Vasquez, Judge <br><br> Trial Court Cause No. 45G01-1703-F3-11 |

**Bailey, Judge.**

# Case Summary

Charles A. McMichael ("McMichael") appeals his convictions, following a jury trial, for burglary, as a Level 4 felony;[1] kidnapping, as a Level 6 felony;[2] residential entry, a Level 6 felony;[3] three counts of invasion of privacy, as Class A misdemeanors;[4] domestic battery, as a Class A misdemeanor;[5] and a habitual offender enhancement.[6]

We affirm.

# Issues

We restate the issues on appeal as follows:

> I.    Whether McMichael waived his challenge to the admissibility of testimony regarding the credibility of the victim's statement to police by failing to state specific grounds for his objection.

---

[1] Ind. Code § 35-43-2-1.

[2] I.C. § 35-42-3-1.

[3] I.C. § 35-43-2-1.5.

[4] I.C. § 35-46-1-15.1(1).

[5] I.C. § 35-42-2-1.3(a)(1).

[6] I.C. § 35-50-2-8.

II. Whether the trial court committed fundamental error when it admitted testimony regarding the credibility of the victim's statement to police.

# Facts and Procedural History

[4] A.S. and McMichael were married for eight years and lived together in a residence located in Hammond. Three of A.S.'s children from her prior relationships lived in the residence as well. By January of 2017, A.S.'s and McMichael's relationship had deteriorated, and McMichael left the marital residence while A.S continued to reside there with her children. However, at some point during the first week of March of 2017, McMichael called A.S. and informed her that he was coming "home" and that "it was going to be a problem" if her children "said anything." Tr. Vol. I at 53. Fearing for her and her children's safety, A.S. and her children went to a hotel.

[5] On March 6, 2017, A.S. obtained an ex parte order for protection against McMichael, and it was served on him on March 7, 2017. The protective order prohibited McMichael from contacting A.S. and her children directly and indirectly and ordered him to stay away from A.S.'s residence and place of employment. However, A.S. was still afraid to return to her residence. Therefore, she and McMichael arranged to meet at A.S.'s residence on the morning of March 8 in order to exchange McMichael's house key for the title to A.S.'s vehicle—which McMichael was driving—with the understanding that McMichael would then leave A.S. alone and allow her to return to her home.

[6] On March 8, at A.S.'s residence, McMichael gave A.S. his house key and they both went inside the house to search for the title to the car. Once inside, McMichael began to choke A.S. and threatened to kill her and himself. Eventually, McMichael released his grip on A.S.'s neck, but he continued to threaten her and accuse her of accessing a dating website. McMichael brandished a pair of scissors at A.S. and demanded that that she give him her password for the dating website. A.S. typed the password into McMichael's cellular telephone, and McMichael accessed A.S.'s account and looked at all her messages on the dating website. After approximately three to four hours, McMichael and A.S. walked out of the house and McMichael began to apologize to A.S. Then they both went back into the house where A.S. found the title to the car and gave it to McMichael. McMichael then left.

[7] The next morning, March 9, McMichael called A.S. and once again demanded her password to the dating website because he could no longer access it. A.S. refused to give him the password, and McMichael informed her that he was "on [his] way" over to her house. Tr. Vol. I at 81. A.S., whose children were at school, immediately collected her belongings and drove away from the house. When she was a few houses away, she observed McMichael "come out of nowhere." *Id*. McMichael sped up to drive behind A.S.'s vehicle and was driving so fast that he almost hit her. When McMichael then pulled in front of A.S. and stopped his vehicle, A.S. parked and waited as she tried to figure out how to escape McMichael.

[8]     A.S. then observed Mercedes Martin ("Martin") and Damon Musgrave ("Musgrave") standing outside their house. A.S. exited her vehicle and screamed at McMichael that she had already sent him the password in a text message. A.S. then yelled to Martin and Musgrave to call the police because her husband was trying to kill her. A.S. ran up to Martin's and Musgrave's house, and McMichael quickly turned his vehicle around and drove into the front yard, where he almost ran over Martin. Inside the house, A.S. told Martin's boyfriend and Courtney Kelley ("Kelley"), Musgrave's girlfriend, "Call the police. My husband's trying to kill me, someone call the police." *Id*. at 166.

[9]     McMichael forced his way into the house through the front door, grabbed A.S. by her hair, called her derogatory names, and told her, "let's go." *Id*. at 89. McMichael looked very angry, violent, and "dangerous." *Id*. at 229. A.S. tried to fight off McMichael, but he grabbed her by her hair and shirt and dragged her back outside. McMichael then attempted to force A.S. into his vehicle, but A.S. resisted and fought against him. A.S. repeatedly told McMichael to stop and stated that she had given him the password he wanted. Someone in the house said, "call the police, get his license plate number." *Id*. at 91. When McMichael heard that, he told A.S., "see what happens next," and then entered his vehicle and drove off. *Id*. A.S. then called 9-1-1.

[10]    Several officers, including Officer David Hornyak ("Officer Hornyak") with the Hammond Police Department, responded to the scene at approximately 8:15 a.m. The officers obtained statements from A.S. and the four occupants of the

house into which A.S. had run. A.S., who was "crying" and "scared, frantic, [and] hysterical," told the officers that her husband was trying to kill her over a password that she had given him via a text message, that she had run into the house for safety before he dragged her out, and that McMichael had been at her house the day before, choking her and threatening her life. Tr. Vol. II at 12, 26. A.S. also showed the officers the protective order that she had against McMichael and informed them that McMichael had told her that he wanted the police to kill him. The officers took photographs of the injuries A.S. had sustained the previous day, and Officer Hornyak created an incident report based on the information A.S. provided to him.

[11] After March 9, McMichael continued to send A.S. voice messages that stated, "this is what you wanted. You got the police after me. You got the restraining order. Nothing's going to stop me. No paperwork. No anything is going to stop me from doing anything." *Id.* at 97. On March 12, McMichael sent A.S. multiple text messages, asking her where she was. A.S. left work at 10:00 p.m. and, as she drove toward her home, she encountered McMichael waiting for her a block away from her house. A.S. tried to maneuver her vehicle away from McMichael, but he turned his vehicle to block her from leaving.

[12] As McMichael approached A.S.'s vehicle, he was crying and telling her to just talk to him. A.S. tried to calm him and urged him to go back to the front of her house because she was on a corner where no one could see her. McMichael followed A.S. to the front of her house as he continued to cry and tell her how sorry he was. McMichael told A.S., "let's work this marriage out. Let's meet

up somewhere. Let's talk." *Id*. at 100. In order to calm McMichael, A.S. agreed to meet him in an "open space" where "everybody can see [them]." *Id*. at 101, 115. A.S.'s children were inside the house, and when they saw McMichael, they called the police. The police arrived shortly thereafter and spoke to A.S. and McMichael. A.S. asked the officers to tell McMichael to leave and never return. McMichael left.

[13] At approximately 6:58 a.m. the next morning, March 13, McMichael sent a text message to A.S. stating, "I can't f---ing sleep, my mind is so driving me nuts," but A.S. did not reply. *Id*. at 114. At 9:15 a.m., he sent a second text message to A.S. asking her if they were "still going to meet up later," to which A.S. responded that she could not. *Id*. at 108-09. McMichael continued to send A.S. text messages, but she would not respond. Finally, McMichael sent a text message to A.S. stating, "I'm coming to your job, f--- it. It's going to happen there with the police since you won't answer me," and he then informed her that he was on his way to her. *Id*. at 116.

[14] A.S. called the police and, shortly thereafter, she received another text message from McMichael that stated "you have the state trooper calling my phone. I told him I'm on my way and I'm going to make them kill me. You asked for it." *Id*. at 118. A.S. did not respond, and McMichael continued to send her additional text messages. Officers came to A.S.'s place of employment, questioned her, and, for her own safety and the safety of others at her workplace, took her with them to the police station until McMichael could be found. Later that day the police found McMichael inside his vehicle at a CVS

Pharmacy in Highland. McMichael threatened to kill himself, so he was taken to the hospital. After his apprehension, McMichael continued to call A.S. repeatedly from the hospital and, later, the jail.

[15] McMichael was arrested and ultimately charged with twelve different counts in relation to the incidents in March. His jury trial took place from December 11 through 13, 2017. A.S. testified regarding all of the incidents in March, and Martin, Musgrave, and Kelley also testified about the events they witnessed on March 9. The State entered into evidence the protective order against McMichael, pictures of the scene in front of Martin's and Musgrave's house on March 9, pictures of the injuries A.S. sustained on March 8, transcripts of text messages McMichael sent to A.S. on March 13, and recordings of the 9-1-1 calls on March 9 and March 13.

[16] In addition, Officer Hornyak testified that he created an incident report on March 9 with the information A.S. provided to him because he "found [A.S.] credible." Tr. Vol. II at 28. McMichael objected to this testimony stating, "Objection to this officer's testimony that he found her credible. That's the reason he wrote a report." *Id.* at 29. The trial court overruled the objection, and Officer Hornyak explained that he found A.S. credible because he "didn't believe she had any reason to be lying about the incident. She appeared to be scared, hysterical." *Id.*

[17] The jury found McMichael guilty of burglary, as a Level 4 felony; kidnapping, as a Level 6 felony; residential entry, a Level 6 felony; three counts of invasion

of privacy, as Class A misdemeanors; and domestic battery, as a Class A misdemeanor. They found him not guilty of the other counts. Thereafter, McMichael admitted his status as a habitual offender. The court held a sentencing hearing on January 17, 2018, and, after merging the residential entry count with the burglary count, the court entered judgments of conviction as to the remaining counts and sentenced McMichael to a total of of eighteen years in the Department of Correction. This appeal ensued.

# Discussion and Decision

## Waiver

[18] McMichael contends that the trial court erred in admitting Officer Hornyak's testimony that he found A.S. credible when he interviewed her at the scene on March 9. At trial, McMichael objected to that testimony, but he did not state a legal basis for his objection. To preserve an error in the admission of evidence for appeal, a party must timely object and state "the specific ground [for the objection], *unless it was apparent from the context*." Ind. Evidence Rule 103(a) (emphasis added). "The overriding purpose of the requirement for a specific and timely objection is to alert the trial court so that it may avoid error or promptly minimize harm from an error that might otherwise require reversal, result in a miscarriage of justice, or waste time and resources." *Camm v. State*, 908 N.E.2d 215, 223 (Ind. 2009) (citation omitted). Thus, "'[a] mere general objection … is ineffective to preserve an issue for appellate review.'" *Reed v.*

*Bethel*, 2 N.E.3d 98, 107 (Ind. Ct. App. 2014) (quoting *Raess v. Doescher*, 883 N.E.2d 790, 797 (Ind. 2008)).

[19]     Here, McMichael's attorney stated, "Objection to this officer's testimony that he found her credible." Tr. Vol. II at 29. Although McMichael did not cite to any specific rule of evidence or case law as the reason for his objection, it is apparent from the context that he made an objection to a witness's "vouching" testimony pursuant to Evid. R. 704(b). That is, he objected because he believed Officer Hornyak testified as to the truth of the allegations against McMichael, in violation of Rule 704(b). Thus, he has not waived our review of that claim.

## Admission of Officer's Testimony

[20]     Assuming—without deciding—that the admission of Officer Hornyak's testimony was erroneous as impermissible vouching testimony under Indiana Rule of Evidence 704(b), any such error was harmless.

> In evaluating whether erroneously admitted evidence was prejudicial, we assess its "probable impact ... upon the jury in light of all of the other evidence that was properly presented. If we are satisfied the conviction is supported by independent evidence of guilt[,] ... the error is harmless." [*Blount v. State*, 22 N.E.3d 559, 564 (Ind. 2014)]. Put another way, "we judge whether the jury's verdict was substantially swayed. If the error had substantial influence, or if one is left in grave doubt, the conviction cannot stand[.]" *Lafayette v. State*, 917 N.E.2d 660, 666–67 (Ind. 2009) (citation omitted).

*Williams v. State*, 43 N.E.3d 578, 583 (Ind. 2015). Thus, in *Palilonis v. State*, 970 N.E.2d 713, 731 (Ind. Ct. App. 2012), *trans. denied*, for example, we held the

error in admitting vouching testimony was harmless where that testimony "dealt with information that was already in evidence from other witnesses' testimony" and was supported by other evidence, such as medical evidence. Furthermore, we have generally held that a defendant is not denied a fair trial where he is given an opportunity to cross-examine the victim and other witnesses concerning the victim's credibility. *See, e.g.*, *Edgin v. State*, 657 N.E.2d 445, 447 (Ind. Ct. App. 1995), *trans. denied*. "Even when the victim's testimony is central to the issue of the defendant's guilt or innocence, the defendant is not prejudiced so long as the finder of fact does not receive a one-sided view of the victim's credibility." *Id.*

[21] Here, the challenged testimony is Officer Hornyak's statement that he created a report documenting A.S.'s March 9 statements about the events that happened on March 9 because he "found her credible." Tr. Vol. II at 28. However, three other eyewitnesses to the events on March 9—Martin, Musgrave, and Kelley— also testified as to those events and related the same information A.S. had related to Officer Hornyak on March 9 and to which she testified at trial. And the State presented additional evidence supporting A.S.'s trial testimony and her statement to Officer Hornyak, namely: the protective order against McMichael; pictures of the scene in front of Martin's and Musgrave's house on March 9; pictures of the injuries A.S. sustained on March 8; transcripts of text messages McMichael sent to A.S. on March 13; and recordings of the 9-1-1 calls A.S. made on March 9 and March 13. Thus, McMichael's convictions were supported by evidence of his guilt independent of A.S.'s testimony or the

statements she made to Officer Hornyak on March 9, making the admission of the alleged vouching testimony harmless error. *Williams*, 43 N.E.3d at 583.

[22] Moreover, McMichael had the opportunity to—and did—cross-examine both Officer Hornyak and A.S. as to the statements A.S. made on March 9 and the testimony she gave at trial regarding the events of March 9. Given that McMichael had the opportunity to challenge A.S.'s credibility, the admission of the alleged vouching testimony did not deprive him of a fair trial. *See Okuly v. State*, 574 N.E.2d 315 (Ind. Ct. App. 1991) (finding no fundamental error in admission of vouching testimony where the defendant was "permitted to repeatedly assail the impression that [the victim] was truthful").

[23] Because McMichael's convictions were supported by evidence independent of Officer Hornyak's alleged vouching testimony, and because McMichael had sufficient opportunity to attack A.S.'s credibility, any error in the admission of Officer Hornyak's testimony as to A.S.'s credibility regarding her March 9 statement was harmless.

# Conclusion

[24] McMichael's objection to Officer Hornyak's testimony was sufficient to preserve the issue of admissibility on appeal. However, even if the admission of the challenged testimony was impermissible, the error was harmless because McMichael's convictions were supported by evidence independent of the

challenged testimony, and he had sufficient opportunity to challenge A.S.'s credibility.

[25] Affirmed.

Vaidik, C.J., and Pyle, J., concur.